R. MARIE SIDES v. DUKE UNIVERSITY, GLORIA FARMER, MEREL
HARMEL, AND JOHN MILLER

No. 8314SC1308

(Filed 7 May 1985)

1. **Master and Servant § 10.2— employment at will—action for wrongful discharge recognized**

    Plaintiff's complaint stated an enforceable claim against defendant Duke Hospital, but not against two other parties who did not employ her, for wrongfully discharging plaintiff from her employment in retaliation for her refusal to testify falsely or incompletely in a medical malpractice case. Plaintiff alleged that she had been a nurse anesthetist at Duke University Medical Center; she had refused to administer drugs she considered dangerous; the doctor ordering the drugs administered them personally; the patient suffered permanent brain damage and a lawsuit was filed by his estate; plaintiff was advised by physicians who worked for Duke and by Duke's attorneys that she should not tell all of what she had seen; plaintiff testified fully and truthfully at her deposition and at trial; another nurse anesthetist who had withheld information at her deposition testified more fully at trial; the jury returned a verdict for the estate; the doctors involved in the lawsuit encouraged hostile attitudes toward plaintiff and many of the doctors at Duke became hostile toward plaintiff; plaintiff's supervisor refused to help her deal with these hostilities; plaintiff was told that she had an abusive attitude and that her work would be closely monitored; plaintiff was not given specific examples of her poor performance, despite her repeated requests; and plaintiff was finally discharged.

2. **Master and Servant § 10.2— wrongful discharge—action for breach of contract**

    Plaintiff's complaint stated a claim for breach of contract where she alleged that she came to Duke University Medical Center from Michigan to accept a position as a nurse anesthetist because she was assured that nurse anesthetists at Duke could not be discharged for reasons other than incompetence and that she was discharged in retaliation for her refusal to testify falsely or incompletely in a medical malpractice case. Even if the employment contract was at will, plaintiff sufficiently alleged a claim for breach of contract because Duke had no right to terminate it for the unlawful purposes alleged in the complaint.

3. **Master and Servant § 13— interference with employment by third party—allegations sufficient**

    Plaintiff stated a claim against two doctors for wrongfully interfering with her contractual relationship with Duke University Medical Center where her complaint alleged that the doctors maliciously undertook to have her discharged because she would not be intimidated into testifying favorably to them in a malpractice case and left no grounds for supposing that she was fired for any other reason. Plaintiff was not required to use the magic words "but for"; moreover, although defendants did have status as "non-outsiders" to

some extent because of their work at Duke University Medical Center and their professional interests in the quality of medical care at that facility, the complaint shows that their actions had no conceivable relationship to their legitimate interests.

**4. Master and Servant § 10.3— wrongful discharge and malicious interference with contract—punitive damages**

Plaintiff's complaint stated a claim for punitive damages against Duke University Medical Center and two doctors based on wrongful discharge and malicious interference with contract where she alleged wanton and reckless disregard of her rights by Duke and actual malice by the doctors. However, plaintiff's punitive damages claim against one of the doctors and her supervisor based on wrongful discharge could not stand because there was no enforceable claim for wrongful discharge against those defendants.

Judge ARNOLD concurring in the result.

APPEAL by plaintiff from *Lee, Judge.* Orders entered 14 October 1983 in Superior Court, DURHAM County. Heard in the Court of Appeals 27 September 1984.

In this civil action plaintiff seeks damages from the several defendants for terminating, or for wrongfully bringing about the termination of, her employment with Duke University. In the complaint several different claims for relief are asserted against various of the defendants, and all of the defendants moved to dismiss the complaint pursuant to Rule 12(b)(6) of the N.C. Rules of Civil Procedure on the grounds that it failed to state a claim upon which relief could be granted. After a hearing on the motions orders were entered dismissing the complaint against each of the defendants, from which the plaintiff appeals. Plaintiff's complaint contains the following allegations of fact:

Until 9 February 1982 plaintiff was employed as a nurse anesthetist at Duke University Medical Center (DUMC), a hospital operated by defendant Duke University (Duke). Defendant Gloria Farmer was the chief nurse anesthetist at DUMC and was plaintiff's immediate supervisor. Defendants Merel Harmel and John Miller were both physicians specializing in anesthesiology, and were also partners in Surgical Private Diagnostic Clinic. Dr. Harmel was also chief of the anesthesiology department at DUMC. Plaintiff began work as a nurse anesthetist at DUMC on 1 November 1970. Before then she worked as a nurse anesthetist in Michigan, and one of the primary inducements for plaintiff leaving Michigan and taking the job at DUMC was job security. She

was assured by Duke agents both at her job interview and again when the job was offered to her that nurse anesthetists at DUMC could only be discharged for incompetence. This understanding of Duke's policy was shared by various other DUMC employees who commented on numerous occasions throughout her more than eleven years of employment at Duke that nurse anesthetists could only be discharged for incompetence.

On or about 22 May 1980 the estate of one Larry Downs initiated a lawsuit against Duke Hospital, Dr. Harmel, Dr. Miller, and others. In that action the plaintiff alleged that Larry Downs when a patient at DUMC had suffered permanent brain damage resulting from the negligent administration of anesthetics by Dr. Miller. Mr. Downs had entered DUMC for cleft palate surgery, and when he came out of the surgery plaintiff was on duty in the recovery room and Dr. Miller instructed her to administer certain anesthetics to Mr. Downs to immobilize him. Plaintiff refused to administer the anesthetics directed by Dr. Miller because she thought those anesthetics would harm the patient and possibly cause his death. Dr. Miller nevertheless personally administered the drugs to Mr. Downs, who stopped breathing, went into cardiac arrest for a time, and suffered permanent brain damage. During the course of pretrial discovery in that case attorneys for Downs' estate took plaintiff's deposition. Before her testimony was taken plaintiff was advised by several physicians who worked at DUMC and by attorneys for Duke and other defendants in that suit that she should not tell all that she had seen relating to Mr. Downs' treatment; some of the doctors warned her that if she did so she "would be in trouble." Pressures like that had already caused another nurse anesthetist at DUMC to withhold information at her deposition. In spite of this when her testimony was taken plaintiff testified fully and truthfully.

After the deposition many of the physicians at DUMC, particularly Doctors Harmel and Miller, began to adopt hostile attitudes toward her. When the case was tried in November 1981 plaintiff again testified fully and truthfully and the nurse anesthetist who earlier withheld some information testified more fully. The jury returned a verdict in favor of Mr. Downs' estate in the amount of $1,750,000. Dr. Harmel viewed plaintiff as the person who had caused them to lose the case. Concerned that her testimony in the case might cause difficulties in her work with

some of the doctors at Duke, plaintiff asked chief nurse Farmer to inform her of any complaints about her work so that she could address them. Ms. Farmer refused to do this. After the Downs trial some physicians displayed a hostile attitude toward plaintiff and some refused to work with her. Dr. Miller told other physicians that they should have nothing to do with her, and Dr. Harmel encouraged these hostile attitudes toward plaintiff. These hostilities made the performance of plaintiff's job duties almost impossible and she asked her chief, Ms. Farmer, to assist her in dealing with them, but she again refused. On 20 January 1982 Ms. Farmer called plaintiff into a meeting with Dr. Lennart Fagreus; at that meeting plaintiff was advised that her job performance was poor in several respects, that she had "an abusive attitude," and that her work would be closely monitored for three months. Since her practices then were substantially no different from what they had been during her preceding eleven years at Duke, she asked for specific examples of the poor performance generally alluded to, but none were given. On or about 22 January 1982 Ms. Farmer wrote plaintiff a letter reiterating the complaints and offered to help her improve her work. This offer of help was accepted by plaintiff in a return letter, in which she again requested that specific instances of her poor performance be given to her; but Ms. Farmer never informed her of any specific instances of poor job performance. On 9 February 1982 Ms. Farmer called plaintiff into a meeting with Dr. Harmel and informed her that she was discharged immediately.

In her complaint plaintiff also claims that: In discharging her Ms. Farmer acted as an agent of Duke; Dr. Harmel encouraged, supported and approved the discharge and was an agent of Duke in so doing; the efforts of Doctors Miller and Harmel to discredit her with other doctors were substantial contributing factors to her discharge; she always performed her work competently and responsibly; her discharge was in retaliation for her testifying truthfully and completely in the Downs lawsuit; and as a result of her discharge plaintiff has not been able to find similar work at other medical facilities and has lost income and fringe benefits of substantial value.

Based on the foregoing allegations, plaintiff seeks to enforce five claims for relief, as follows: *First Claim*—that there was a contract with Duke not to discharge her for any cause other

than incompetent performance of her duties, and the discharge breached the contract, for which she is entitled to compensatory damages from defendants Duke, Farmer and Harmel; *Second Claim*—that her discharge in retaliation for testifying fully and truthfully in court was a wrongful discharge in violation of public policy, entitling her to compensatory damages from defendants Duke, Farmer and Harmel; *Third Claim*—that the acts and efforts of Doctors Harmel and Miller were carried out for the malicious purpose of accomplishing her discharge and interfering with her contractual and economic relations with Duke, for which she is entitled to compensatory damages from them; *Fourth Claim*—that her wrongful discharge in retaliation for truthfully testifying in court was a wanton and reckless violation of public policy and her rights, for which punitive damages should be assessed against defendants Duke, Farmer and Harmel; and *Fifth Claim*—that the acts and efforts of Doctors Miller and Harmel to bring about her wrongful discharge and interfere with her contractual relations were done with actual malice, thereby entitling her to punitive damages from them.

*Edelstein, Payne and Jordan, by M. Travis Payne, for plaintiff appellant.*

*Powe, Porter & Alphin, by N. A. Ciompi and William E. Freeman, for defendant appellees Duke University and Gloria Farmer.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by James G. Billings, Susan M. Parker, and Susan E. Rector, for defendant appellees Merel Harmel and John Miller.*

*The North Carolina Academy of Trial Lawyers, by Kathy A. Klotzberger, as amicus curiae.*

PHILLIPS, Judge.

Does the complaint which alleges that plaintiff was discharged from her job at Duke University Medical Center in retaliation for her refusal to withhold testimony or testify untruthfully in a lawsuit against some of the defendants state a claim for relief against any of the defendants? That is the only question presented by this appeal. Plaintiff contends that she has pleaded legally enforceable claims for relief in both tort and con-

tract against various of the defendants. We consider first whether plaintiff has pleaded a claim for relief in tort for wrongful discharge.

WRONGFUL DISCHARGE

[1]   At the threshold we are confronted by the decision of this Court in *Dockery v. Lampart Table Co.*, 36 N.C. App. 293, 244 S.E. 2d 272, *disc. rev. denied*, 295 N.C. 465, 246 S.E. 2d 215 (1978). In that case, speaking through Judge Mitchell, now Justice Mitchell, this Court held that an employee at will in this State has no enforceable claim against his employer for "retaliatory discharge," an action that many courts in this country have recognized and enforced under various circumstances. The plaintiff in that case, so he alleged, was discharged in retaliation for filing a workers' compensation claim against his employer. The general common law rule, of course, in this and other jurisdictions, as the plaintiff recognized, is that when a contract of employment does not fix a definite term the employment is terminable without cause at the will of either party. *Bishop v. Wood*, 426 U.S. 341, 48 L.Ed. 2d 684, 96 S.Ct. 2074 (1976); *Smith v. Ford Motor Co.*, 289 N.C. 71, 221 S.E. 2d 282 (1976). The plaintiff in *Dockery* argued that notwithstanding the general rule the Court should and could recognize plaintiff's wrongful discharge action either on the ground that it was authorized by statute or on the ground that public policy required it. His main reliance was on the case of *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E. 2d 425 (1973), where, on facts similar to *Dockery*, the Indiana Supreme Court carved out a "retaliatory discharge" exception to the common law doctrine that contracts of an indefinite duration are terminable at will and without legal recourse. Plaintiff pointed out that the Indiana Workers' Compensation Law provided, as did the North Carolina Workers' Compensation Act through G.S. 97-6, that no employer could avoid its obligation under the law by any agreement, rule, regulation or other device; and that the *Frampton* court viewed the discharge by the employer in retaliation for the employee filing a workers' compensation claim as a "device" for avoiding its obligations under the law, since its inevitable effect would be to discourage other injured workers from filing claims, and therefore wrongful and actionable.

In rejecting this argument the *Dockery* court noted that: The decision of the Indiana Supreme Court in *Frampton* was based upon its approval of the retaliatory eviction defense which many courts permit in tenancy at will eviction cases and that this defense had been disapproved by this Court in *Evans v. Rose*, 12 N.C. App. 165, 182 S.E. 2d 591, *cert. denied*, 279 N.C. 511, 183 S.E. 2d 686 (1971). The Court concluded that "failure of the General Assembly to specifically provide the claim for relief alleged by the plaintiff was an indication of its intent that no such claim be created." 36 N.C. App. at 300, 244 S.E. 2d at 277. In so concluding, the Court may not have read the legislative intent as to retaliatory discharge actions aright. In all events at the next session after the *Dockery* decision came down the General Assembly expressly authorized actions by employees demoted or discharged in retaliation for instituting a workers' compensation proceeding in good faith or for testifying in regard to it. G.S. 97-6.1. At that same session the General Assembly also authorized the affirmative defense of retaliatory eviction in certain summary ejectment cases. G.S. 42-37.1. The alacrity with which the legislature acted in both of these fields after that deficiency in the statutes was pointed out tends to show, we think, that the legislature is not at all adverse to courts of this State entertaining actions based on a violation of policies that have been enacted or otherwise established for the protection and benefit of the public. And we must say that no rational reason for the legislature generally opposing the enforcement of its enactments by the civil courts occurs to us, and would think that in the absence of a declaration to the contrary it should be assumed that the legislature favors the enforcement of the law by all legitimate and customary means, including suits in the civil courts in proper cases.

But whether or not the *Dockery* refusal to recognize an action for retaliatory discharge has been undermined by those enactments of the General Assembly, the public policy considerations that affect this case are much more compelling than those that affected that case. Though the public has a strong interest in allowing workers to pursue their statutory remedies for workers' compensation without being in fear of losing even greater benefits — their jobs and means of livelihood — if they do, the public interest in preventing the obstruction of justice is greater still. Perjury and the subornation of perjury were both felonies at com-

mon law and are so punishable by G.S. 14-209 and G.S. 14-210. The intimidation of witnesses was an offense at common law and is punishable by G.S. 14-226 as a misdemeanor. These offenses are also an affront to the integrity of our judicial system, an impediment to the constitutional mandate of the courts to administer justice fairly, and a violation of the right that all litigants in this State have to have their cases tried upon honest evidence fully given. Indeed, as every citizen of ordinary intelligence must surely know, under our law before any witness can testify in any civil or criminal case he must solemnly affirm or swear that the evidence given by him "shall be the truth, the whole truth, and nothing but the truth." G.S. 11-11. Because of these distinctions we do not view *Dockery* as controlling this case, and believe that to deny that an enforceable claim has been stated in this instance would be a grave disservice to the public and the system of law that we are sworn to administer, no principle of which requires that civil immunity be given to those who would defile or corrupt it.

It is generally agreed that the terminable-at-will doctrine was the prevailing common law in the latter part of the nineteenth century:

> With us the rule is inflexible, that a general or indefinite hiring is *prima facie* a hiring at will and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof. . . . [I]t is an indefinite hiring and is determinable at the will of either party. . . .

H. G. Wood, *Master and Servant* § 134 (1877) *quoted in* Feinman, *The Development of the Employment at Will Rule*, 20 Am. J. of Legal History, 118, 126 (1976). But this represented a departure from the earlier English common law rule that contracts of indefinite duration were presumed to be for a year, 2 W. Blackstone, *Commentaries*, 425; Feinman, *supra* at 119-22; and at least one court has questioned whether Wood's statement was supported by the authority it cited and was accurate when written. *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W. 2d 834 (1983).

The common law of North Carolina is the common law of England as it existed when independence was declared in 1776. *Steelman v. City of New Bern*, 279 N.C. 589, 184 S.E. 2d 239

(1971). Inasmuch as the terminable-at-will doctrine may not have been a part of the English common law, it is thus possible that the pedigree of our common law rule is questionable. Nevertheless, the rule was well suited to the socio-economic climate that necessitated its development, *see* Comment, *A Common Law Action for the Abusively Discharged Employee*, 26 Hastings Law Journal, 1434, 1440-41 (1975), and, correctly or not, our courts have long adhered to the rule. *E.g. Still v. Lance*, 279 N.C. 254, 182 S.E. 2d 403 (1971); *Tuttle v. Kernersville Lumber Co.*, 263 N.C. 266, 139 S.E. 2d 249 (1964); *May v. Tidewater Power Co.*, 216 N.C. 439, 55 S.E. 2d 308 (1939). *See generally*, Note, *Workers' Compensation—Retaliatory Discharge—The Legislative Response to Dockery v. Lampart Table Co.*, 58 N.C. L. Rev. 629 (1980).

In recent years, the rule has come under increasing criticism from scholars, *e.g.* Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power*, 67 Colum. L. Rev. 1404 (1967); Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute*, 62 Va. L. Rev. 481 (1976); Peck, *Unjust Discharges from Employment: A Necessary Change in the Law*, 40 Ohio St. L. J. 1 (1979); Note, *Protecting Employees at Will Against Wrongful Discharge: The Public Exception*, 96 Harv. L. Rev. 1931 (1983); Note, *Continued Resistance to the Inclusion of Personnel Policies in Contracts of Employment: Griffin v. Housing Authority of Durham*, 62 N.C. L. Rev. 1326 (1984); Note, *Workmen's Compensation—No Private Right of Action for Retaliatory Discharge in North Carolina*, 15 Wake Forest L. Rev. 139 (1979), as being unfair and no longer suited to the evolving economic relations between employer and employee. Similarly, courts have begun to respond to a perceived need to protect non-contract employees from abusive practices by the employer. *See* Comment, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 Harv. L. Rev. 1816, 1818-24 (1980).

The California case of *Petermann v. International Brotherhood, etc.*, 174 Cal. App. 2d 184, 344 P. 2d 25 (1959), was the seminal case in recognizing a limitation on the common law doctrine. There, in a situation involving policy considerations similar to the present one, an employee who had been discharged from his job for refusing to give false answers to a legislative committee attempted to sue his employer. The trial court, relying on the

terminable at will doctrine, granted the employer's motion for
non-suit. The California Court of Appeals reversed, recognizing
the doctrine but holding that an employer's right thereunder to
discharge an employee "may be limited by statute or by con-
siderations of public policy." 174 Cal. App. 2d at 188, 344 P. 2d at
27 (citations omitted). That court expressed the applicable public
policy considerations as follows:

> The presence of false testimony in any proceeding tends to
> interfere with the proper administration of public affairs and
> the administration of justice. *It would be obnoxious to the in-*
> *terests of the state and contrary to public policy and sound*
> *morality to allow an employer to discharge any employee,*
> *whether the employment be for a designated or unspecified*
> *duration, on the ground that the employee declined to com-*
> *mit perjury, an act specifically enjoined by statute.* The
> threat of criminal prosecution would, in many cases, be a suf-
> ficient deterrent upon both the employer and employee, the
> former from soliciting and the latter from committing per-
> jury. However, in order to more fully effectuate the state's
> declared policy against perjury, the civil law, too, must deny
> the employer his generally unlimited right to discharge an
> employee whose employment is for an unspecified duration,
> when the reason for the dismissal is the employee's refusal to
> commit perjury. *To hold otherwise would be without reason*
> *and contrary to the spirit of the law. The public policy of this*
> *state as reflected in the penal code sections referred to*
> *above would be seriously impaired if it were to be held that*
> *one could be discharged by reason of his refusal to commit*
> *perjury. To hold that one's continued employment could be*
> *made contingent upon his commission of a felonious act at*
> *the instance of his employer would be to encourage criminal*
> *conduct upon the part of both the employee and employer*
> *and would serve to contaminate the honest administration of*
> *public affairs.* This is patently contrary to the public welfare.
> The law must encourage and not discourage truthful testi-
> mony. The public policy of this state requires that every im-
> pediment, however remote to the above objective, must be
> struck down when encountered. (Emphasis added.)

174 Cal. App. 2d at 188-89, 344 P. 2d at 27. Subsequent cases from
other states have recognized a common law cause of action in tort

for employees at will who are discharged for reasons that are in some way wrongful or socially undesirable. *See, e.g., Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A. 2d 385 (1980) [quality control director discharged for insistence that employer comply with federal and state food, drug and cosmetics laws]; *Parnar v. Americana Hotels, Inc.,* 65 Hawaii 370, 652 P. 2d 625 (1982) [employee discharged to prevent testimony before grand jury or any subsequent criminal trial]; *Palmateer v. International Harvester Co.,* 85 Ill. 2d 124, 421 N.E. 2d 876 (1981) [employee discharged for informing police of crimes of another employee and agreeing to testify against him]; *Trombetta v. Detroit, Toledo & Ironton R.R. Co.,* 81 Mich. App. 489, 265 N.W. 2d 385 (1978) [employee discharged for refusing to alter results of tests on pollution control reports]; *Nees v. Hocks,* 272 Or. 210, 536 P. 2d 512 (1975) [employee discharged for failure to refuse jury duty]; *Reuther v. Fowler & Williams, Inc.,* 255 Pa. Super. 28, 386 A. 2d 119 (1978) [employee discharged for serving jury duty]; *Harless v. First National Bank,* 246 S.E. 2d 270 (W.Va. 1978) [employee discharged for efforts to make employer comply with state and federal consumer protection credit laws].

Cases from other jurisdictions have recognized a cause of action when the discharge was in violation of a statute. *E.g. Frampton v. Central Indiana Gas Co., supra; Murphy v. City of Topeka-Shawnee County,* 6 Kan. App. 2d 488, 630 P. 2d 186 (1981); *Lally v. Copygraphics,* 85 N.J. 668, 428 A. 2d 1317 (1981); *Kelsay v. Motorola, Inc.,* 74 Ill. 2d 172, 384 N.E. 2d 353 (1978); *Sventco v. Kroger Co.,* 69 Mich. App. 644, 245 N.W. 2d 151 (1976); *Texas Steel Co. v. Douglas,* 533 S.W. 2d 111 (Tex. Civ. App. 1976). All of the above cases involve employees discharged for asserting their rights under workers' compensation laws in the particular states. It should be noted, however, that not all of the compensation laws involved in these cases specifically provide a remedy, as North Carolina now does.

Some courts have recognized the need for a common law cause of action for wrongful discharge, but have not met with appropriate facts for applying it. *E.g. Jackson v. Minidoka Irrigation Dist.,* 98 Idaho 330, 563 P. 2d 54 (1977); *Scroghan v. Kraftco Corp.,* 551 S.W. 2d 811 (Ky. 1977); *Adler v. American Standard,* 291 Md. 31, 432 A. 2d 464 (1981); *Keneally v. Orgain,* 606 P. 2d 127 (Mont. 1980); *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A. 2d

505 (1980); *Ward v. Frito-Lay, Inc.*, 95 Wis. 2d 372, 290 N.W. 2d 536 (1980). Still other courts have flatly refused to recognize a limitation or modify the common law doctrine. *E.g. Griffith v. Sollay Foundation Drilling, Inc.*, 373 So. 2d 979 (La. App. 1979); *Jones v. Koegh*, 137 Vt. 562, 409 A. 2d 581 (1979). Some have refused to do so absent a statutory mandate. *Lampe v. Presbyterian Medical Center*, 41 Colo. App. 465, 590 P. 2d 513 (1978). *Dockery v. Lampart Table Co.*, *supra*, appears to fall into this last category.

But none of the foregoing discussions of the at will doctrine, or any others that we have seen, focuses on what we believe is the fundamental fact upon which the at will doctrine rests, a fact that is crucial to this case, in our judgment. We refer to the obvious and indisputable fact that in a civilized state where reciprocal legal rights and duties abound the words "at will" can never mean "without limit or qualification," as so much of the discussion and the briefs of the defendants imply; for in such a state the rights of each person are necessarily and inherently limited by the rights of others and the interests of the public. An at will prerogative without limits could be suffered only in an anarchy, and there not for long — it certainly cannot be suffered in a society such as ours without weakening the bond of counterbalancing rights and obligations that holds such societies together. Thus, while there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. A different interpretation would encourage and sanction lawlessness, which law by its very nature is designed to discourage and prevent. We hold, therefore, that no employer in this State, notwithstanding that an employment is at will, has the right to discharge an employee and deprive him of his livelihood without civil liability because he refuses to testify untruthfully or incompletely in a court case, as plaintiff alleges happened here. One of the merited glories of this country is the multitude of rights that its people have, rights that are enforced as a matter of course by our courts, and nothing could be more inimical to their enjoyment than the unbridled law defying actions of some and the false or incomplete testimony of others. If we are to have law, those who so act against the public interest must be held accountable for the harm

inflicted thereby; to accord them civil immunity would incongruously reward their lawlessness at the unjust expense of their innocent victims.

We hold, therefore, that plaintiff's complaint, the allegations of which need not be repeated, states an enforceable claim against the defendant Duke for wrongfully discharging her from her employment in retaliation for her refusal to testify falsely or incompletely in the case referred to, and that part of the order appealed from is reversed. But this claim was properly dismissed as to Ms. Farmer and Dr. Harmel, since it is alleged that her employment contract was with Duke University, rather than either of them, and that part of the order is affirmed.

Even if the step we now take should be regarded as a departure from common law and clear precedent, and we do not believe that it is, it would not be the first such step that has been properly taken by the Courts of this State. In *Rabon v. Rowan Memorial Hospital, Inc.*, 269 N.C. 1, 152 S.E. 2d 485 (1967), our Supreme Court abolished the common law immunity that had unjustly and irrationally protected charitable institutions from liability for negligently injuring patients in hospitals operated by them. This was done, so the Court said, because the rule could not be supported by either law or logic and public policy and the interests of justice required its abolition. Because the language there used is appropriate to the situation now before us, we quote the following from Justice Sharp's opinion:

> This Court has never overruled its decisions lightly. No court has been more faithful to *stare decisis*. In matters involving title to property, its policy has been to leave changes in the law to the legislature. And always it has recognized "the gravity of the proposition that we shall reverse a decision of this court" as Connor, J., said in *Mial v. Ellington*, 134 N.C. 131, 139, 46 S.E. 961, 963-64, reversing *Hoke v. Henderson*, 15 N.C. 1. Nevertheless, when the duty has seemed clear, it has done so, recognizing that the membership of succeeding courts may well regard its membership as no less fallible. . . . As Stacy, J. (later C.J.), said in *Spitzer v. Comrs.*, 188 N.C. 30, 32, 123 S.E. 636, 638: "There is no virtue in sinning against light or in persisting in palpable error, for nothing is settled until it is settled right." Almost a quarter

of a century later, Ervin, J., said: "The doctrine of *stare decisis* will not be applied in any event to preserve and perpetuate error and grievous wrong." *State v. Ballance*, 229 N.C. 764, 767, 51 S.E. 2d 731.

269 N.C. at 20-21, 152 S.E. 2d at 498. And in *Stanback v. Stanback*, 297 N.C. 181, 254 S.E. 2d 611 (1979), for the good and sufficient reasons stated therein, our Supreme Court recognized that under certain circumstances the law authorizes an action for intentionally inflicting emotional distress.

While it is the function of courts to interpret rather than make law, it must nevertheless be borne in mind that the common law is not a collection of archaic, abstract legal principles as the briefs of the defendants imply — it is a living system of law that, like the skin of a child, grows and develops as the customs, practices and necessities of the people it was adopted for change. The common law had its genesis in the customs and practices of the people, and its genius, as many of the country's greatest jurists and legal scholars have pointed out, is not only its age and continuity, but its vitality and adaptability.

> If one were to attempt to write a history of the law in the United States, it would be largely an account of the means by which the common-law system has been able to make progress through a period of exceptionally rapid social and economic change. Law performs its function adequately only when it is suited to the way of life of a people. With social change comes the imperative demand that law shall satisfy the needs which change has created, and so the problem, above all others, of jurisprudence in the modern world is the reconciliation of the demands, paradoxical and to some extent conflicting, that law shall at once have continuity with the past and adaptability to the present and the future.

Harlan F. Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 4, 11 (1936). *See also* O. W. Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457 (1897).

### BREACH OF CONTRACT

[2] Even if the employment contract was at will, for the same public policy reasons stated above, we hold that defendant Duke had no right to terminate it for the unlawful purposes alleged in

the complaint, and that plaintiff's claim for breach of contract with resulting damages has been sufficiently alleged against the defendant Duke. Thus, this part of the order is reversed, but as with plaintiff's claim for wrongful discharge the trial court's dismissal of this claim as to the defendants Harmel and Farmer is affirmed, because it is not alleged that plaintiff was employed by either of them.

But, according to the complaint, the employment contract may not have been at will, since it alleges that plaintiff was assured by Duke that she could only be discharged for incompetence, these assurances induced her to move here from Michigan in order to accept the job offer, and were part of her employment contract. In *Tuttle v. Kernersville Lumber Co.*, 263 N.C. 216, 139 S.E. 2d 249 (1964), our Supreme Court by quoting with apparent approval certain provisions of 56 C.J.S. *Master and Servant*, appeared to recognize that the giving of a consideration by the employee in addition to the usual obligation of service can give rise to a contract for as long as the services are satisfactorily performed even though no definite term is agreed to. And this Court, citing *Tuttle*, said this in *Burkhimer v. Gealy*, 39 N.C. App. 450, 454, 250 S.E. 2d 678, 682, *disc. rev. denied*, 297 N.C. 298, 254 S.E. 2d 918 (1979):

> Generally, employment contracts that attempt to provide for permanent employment, or "employment for life," are terminable at will by either party. Where the employee gives some special consideration in addition to his services, such as relinquishing a claim for personal injuries against the employer, *removing his residence from one place to another in order to accept employment*, or assisting in breaking a strike, such a contract may be enforced. (Emphasis added.)

The additional consideration that the complaint alleges, her move from Michigan, was sufficient, we believe, to remove plaintiff's employment contract from the terminable-at-will rule and allow her to state a claim for breach of contract since it is also alleged that her discharge was for a reason other than the unsatisfactory performance of her duties.

INTERFERENCE WITH CONTRACT

[3] We now consider whether plaintiff's complaint alleges a claim for relief against Doctors Harmel and Miller for wrongfully

interfering with her contractual relationship with Duke. This cause of action is recognized in North Carolina, *Childress v. Abeles*, 240 N.C. 667, 84 S.E. 2d 176 (1954), and will lie even though the contract of employment is terminable at will. *Smith v. Ford Motor Co.*, 289 N.C. 71, 221 S.E. 2d 282 (1976); *Fitzgerald v. Wolf*, 40 N.C. App. 197, 252 S.E. 2d 523 (1979). The elements of this action are: (1) that a valid contract existed between the plaintiff and a third person; (2) that an outsider to the contract had knowledge of the contract; (3) that the outsider intentionally induced the third person not to perform his or her contract with the plaintiff; (4) that the outsider had no justification for so doing; and (5) that the plaintiff suffered damages as a result. *Smith v. Ford, supra*. Plaintiff's complaint clearly meets these requirements. It alleges that she had a contract with Duke and had worked in her position for more than eleven years. Though not specifically alleged, that Doctors Harmel and Miller knew about the contract is clearly established by other allegations. And it alleges that: (a) the actions of Doctors Harmel and Miller, already described, were taken for the purpose and with the intention of causing her discharge; (b) they sought to have her discharged in retaliation for her truthful testimony in a lawsuit involving them; (c) their actions were "material" and "substantial contributing factors" in her discharge; and (d) she has suffered damages as a result of the discharge.

Defendants Harmel and Miller contend that the complaint against them is deficient in several respects. They contend that plaintiff must allege that her damages would not have occurred "but for" their actions and that her complaint is fatally defective for failing to so allege. In support of this contention they cite us to the cases of *Smith v. Ford Motor Co., supra, Spartan Equipment Co. v. Air Placement Equipment Co.*, 263 N.C. 549, 140 S.E. 2d 3 (1965), and *Lloyd v. Carnation Co.*, 61 N.C. App. 381, 301 S.E. 2d 414 (1983), among others. This contention is rejected. In our reading of the cited cases and others, we detect no mandate for the use of the magic words "but for," the *dicta* in *Lloyd* notwithstanding. Rather, we read those cases to say that the complaint in an action for malicious interference with contract must clearly allege that the actions of the defendant were the cause of the plaintiff's damages and that the complaint admits of no other motive for those actions than malice. *Childress v. Abeles, supra*

requires only that "the outsider's act *caused* the plaintiff actual damages." *Id.* at 674, 84 S.E. 2d at 182. (Emphasis added.) This may be compared with actions for negligence where the defendant's actions need only be *a proximate cause* of plaintiff's alleged injury. *Hester v. Miller*, 41 N.C. App. 509, 255 S.E. 2d 318, *disc. rev. denied*, 298 N.C. 296, 259 S.E. 2d 913 (1979). While the words "but for" are in wide usage and undoubtedly meet the requirements for sufficiently pleading this cause of action, they are not the exclusive means of doing so. Plaintiff's complaint clearly alleges that Doctors Harmel and Miller maliciously undertook to have her discharged from her job because she would not be intimidated into testifying favorably to them in the Downs case and leaves no ground for supposing that she was fired for any other reason. If plaintiff can prove her allegations the defendants should not be allowed to escape liability because plaintiff's attorneys did not say "but for." To hold otherwise would be to return to the type of hypertechnical pleading that our Rules of Civil Procedure, G.S. 1A-1, and Rule 1 *et seq.* replaced. *Sutton v. Duke*, 277 N.C. 94, 176 S.E. 2d 161 (1970).

Defendants Harmel and Miller further contend that plaintiff's action for malicious interference with contract against them was properly dismissed because of their status relative to plaintiff's contract with Duke. Arguing that the "primary prerequisite" in a cause of action for malicious interference with contract is that the defendant be an "outsider" to the contract, they contend that their interest in the contract gives them the status of non-outsiders and precludes the maintenance of this action against them by plaintiff. We disagree. In *Smith v. Ford Motor Co.*, *supra*, our Supreme Court noted that the use of the term "outsider" was "peculiar to this jurisdiction," 289 N.C. at 87, 221 S.E. 2d at 292. The Court further noted that the term "appears to connote one who was not a party to the terminated contract and who had no legitimate business interest of his own in the subject matter thereof." *Id.* The *Smith* Court went on to hold that the non-outsider status of a defendant was immaterial where the allegations in the complaint showed that defendants' motives for procuring the termination of the employment contract were not related to his business interest in the contract. That Court distinguished the case of *Wilson v. McClenny*, 262 N.C. 121, 136 S.E. 2d 569 (1964), wherein plaintiff, the president of a corpora-

tion, was dismissed and brought an action against four of the corporate directors. The *Smith* Court noted that the defendants in *Wilson* had a financial interest as stockholders in the corporation and therefore had a fiduciary duty to insure proper management. The case of *Dawson v. Radewicz*, 63 N.C. App. 731, 306 S.E. 2d 171 (1983) is distinguishable from the present case for the same reason. There, the defendant sheriff recommended against the local ABC board employing plaintiff, who had been a deputy in the sheriff's department but supported another candidate for sheriff in the election that put defendant in office. In making his views known to the Board, the Sheriff stated that it would be difficult for him and the plaintiff to work together, as law enforcement officers in the same area must, because of their political differences. These differences though largely personal were viewed by the Court as justifying defendant's interference with plaintiff's prospective employment, since he was the chief law enforcement officer in the county and he had a legitimate interest in promoting effective law enforcement.

Here, though defendants did have status as "non-outsiders" to some extent because of their work at Duke University Medical Center and their professional interest in the quality of medical care at that facility, the complaint shows that their actions resulting in plaintiff's discharge had no conceivable relationship to their legitimate interests, whatever they were. The complaint alleges that defendants were motivated neither by their legitimate professional interests nor by any deficiency on plaintiff's part to properly perform her duties as a nurse anesthetist, but by their malicious and wrongful desire to retaliate against her because of her truthful testimony against them in the Downs lawsuit. Taking these allegations as true for the purposes of this appeal, as we are required to do, plaintiff's complaint states a claim for relief for malicious interference with contract against both Doctors Miller and Harmel and this part of the order is also reversed.

## PUNITIVE DAMAGES

[4] In this State, punitive damages can be recovered only for tortuous conduct and then only on proof that the defendant acted to cause plaintiff's injury wilfully, with malice, or with a reckless disregard for plaintiff's rights. *Hardy v. Toler*, 288 N.C. 303, 218

S.E. 2d 342 (1975); *Lutz Industries, Inc. v. Dixie Home Stores*, 242 N.C. 332, 88 S.E. 2d 333 (1955). *See generally*, 5 Strong's N.C. Index 3d, *Damages* §§ 11-11.2 (1977 and Supp. 1984). Thus, plaintiff's plea for punitive damages in the claims for wrongful discharge and malicious interference with contract was appropriate, since both claims sound in tort and Duke's wanton and reckless disregard of her rights is pleaded in the former and the actual malice of Doctors Harmel and Miller is pleaded in the latter. But plaintiff's plea for the award of punitive damages from the defendants Farmer and Harmel in the wrongful discharge claim cannot stand in view of our ruling that no enforceable claim for wrongful discharge has been stated against these defendants.

CONCLUSION AND MANDATE

The order dismissing the complaint against the defendant Gloria Farmer is affirmed.

The order dismissing the complaint against the defendant Duke University is reversed.

The order dismissing the complaint against Dr. Harmel is affirmed as to the claims asserted against this defendant in plaintiff's *First, Second,* and *Fourth Claims*; but it is reversed as to the claims stated in plaintiff's *Third* and *Fifth Claims*.

The order dismissing the complaint against the defendant Dr. Miller is reversed.

Affirmed in part; reversed in part.

Judge JOHNSON concurs.

Judge ARNOLD concurs in the result.

Judge ARNOLD concurring in the result.

I concur in that portion of the majority opinion which holds that the trial court properly dismissed the plaintiff's complaint against the defendant Farmer. I also concur in those portions which hold that the plaintiff has stated a claim for breach of contract and for tortious interference with contract.

While I do not agree with the reasoning found in the wrongful discharge portion of the majority's opinion, I do believe that under the peculiar facts of this case the plaintiff has arguably stated a claim based upon her discharge by the defendant Duke Hospital. While I would reach this result through a different approach, inasmuch as this case involves such important issues and since it has been before this Court for over seven months, more than twice as long as allowed by our rules, I will not delay it any longer by writing an in-depth concurring opinion. I will simply state that I concur in the result.