**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

HENRY J. BALEVIC,
Plaintiff-Appellant,

v.

No. 96-1813

NICHOLAS WEHRMANN, JR.; JIM D.
WALLER; ITHACA INDUSTRIES, a
Delaware Corporation,
Defendants-Appellees.

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Richard L. Voorhees, Chief District Judge.
(CA-93-57-5-V)

Argued: December 4, 1997

Decided: May 1, 1998

Before NIEMEYER, Circuit Judge, WILSON,
Chief United States District Judge for the Western District of
Virginia, sitting by designation, and JONES, United States District
Judge for the Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Vance Barron, Jr., Greensboro, North Carolina, for
Appellant. John Michael Logsdon, MCELWEE & MCELWEE, North
Wilkesboro, North Carolina, for Appellees. **ON BRIEF:** William H.

McElwee, III, MCELWEE & MCELWEE, North Wilkesboro, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Henry J. Balevic ("Balevic"), the former director of security for Ithaca Industries, Inc. ("Ithaca"), appeals the district court's entry of summary judgment for Ithaca, its president and chief executive officer, Jim D. Waller ("Waller"), and its executive vice-president, Nicholas J. Wehrmann, Jr. ("Wehrmann"), in Balevic's diversity action for wrongful discharge, tortious interference with contract, and breach of two shareholders' agreements. We affirm.

I.

Ithaca is a large textile manufacturing company. It has more than twenty manufacturing facilities in North Carolina, South Carolina, and Georgia, four regional distribution centers, and more than eight thousand employees. Ithaca employed Balevic, a Georgia resident, as its director of security from January, 1986 until August, 1992. In August 1992, following Balevic's acrimonious investigation of Tony Hall, Ithaca's plant manager in Edison, Georgia, Waller, Ithaca's president and chief executive officer, summoned Balevic to his office in North Carolina and discharged him.

According to Balevic, the investigation resulted from allegations that Tony Hall, the son of one of Ithaca's vice-presidents, Frank Hall, had smoked marijuana with employees at Ithaca's plant in Alma, Georgia. Balevic investigated the allegation but found no proof. Ithaca nevertheless tested Tony Hall for drug use in November of 1991 and January of 1992, and both tests were negative. Despite the nega-

2

tive test results, Balevic continued his aggressive investigation into Tony Hall's activities.[1] In 1992, Ithaca transferred Tony Hall to the position of plant manager in Edison, Georgia. Balevic then arranged for the placement of an undercover agent in the Edison plant to spy on him. Upon learning that Balevic had been in contact with the chief of the Edison police department and that Balevic had placed an undercover agent in the plant, Tony Hall contacted his father, who complained to Waller about Balevic's conduct. Frank Hall also called Wehrmann, who, in addition to being Ithaca's executive vice-president, is the son of Nicholas J. Wehrmann, Sr., the chairman of Ithaca's board of directors.[2]

Wehrmann agreed to travel to Edison along with Steve Propst, Ithaca's director of human resources, to investigate Balevic's actions. While in Edison, Wehrmann and Propst spoke with several persons involved in Balevic's Edison investigations, including the Edison police chief and the undercover agent, Dallas Henry. Henry told Propst and Wehrmann that Balevic had referred to the Hall family as "lowlifes" and "thieves," that Balevic had said that Tony Hall and his brother were dealing drugs at Ithaca's plants, and that Balevic had employed him to "watch" Tony Hall. Henry noted, however, that he had never seen any of the wrongdoing that Balevic had alleged. After returning with Wehrmann to North Carolina, Propst phoned Waller and told him what he had learned. As a result, Waller called Balevic, told him to cease his investigation, and to report to him in Wilkesboro, North Carolina the following week. At the meeting the following week, which Balevic surreptitiously recorded, Waller expressed concern that Balevic had "people spying on each other" and had used "strong arm tactics" and as a result, employees no longer felt comfort-

_____

[1] Waller asserts in an affidavit that he told Balevic after the negative drug tests to stop investigating Tony Hall absent further evidence or reports of drug use by Hall. Balevic has controverted that assertion under oath. As we are reviewing the district court's grant of summary judgment, we must accept as true Balevic's version of this disputed fact.

[2] In the course of performing his duties as director of corporate security, Balevic also alleges that he received information that Wehrmann was involved in illegal drug use and the diversion of corporate property. Balevic states that he reported Wehrmann's alleged misconduct to Waller.

able confiding in Balevic. Waller told Balevic that he had spoken with a number of people that had no reason to be vindictive and that Balevic had "hurt [himself] enough" that he could no longer be effective. Waller then fired him.

When fired, Balevic had 1,250 shares of Ithaca stock pursuant to two shareholders' agreements. A thousand of those shares were "protected shares." The shareholders' agreements provided that Ithaca could notify Balevic within ninety days of his termination that it intended to repurchase Balevic's protected shares at book value. Ithaca gave the required notice and paid Balevic book value -- $65.95 per share.

The shareholders' agreements also provided that if Ithaca merged "into another corporation" within six months of a share repurchase, Ithaca would pay the shareholder any difference between the repurchase price per share and the merger price per share. In December of 1992, less than six months from Balevic's firing, a transaction occurred in which Ithaca Merger, Inc. ("Ithaca Merger") merged into Ithaca, the shareholders of Ithaca exchanged their shares for shares of a holding company, Ithaca Holdings, Inc. ("Ithaca Holdings"), and Ithaca became a wholly owned subsidiary of Ithaca Holdings. Each share of Ithaca Holdings had a value of $125.

II.

Balevic, an at-will employee, contends that Ithaca, in contravention of North Carolina's public policy, terminated him for investigating Ithaca's plant manager in Edison, Georgia for suspected drug offenses in Georgia. The district court applied Georgia law based on the "most significant relationship" choice of law test. Since Georgia does not recognize public policy exceptions to the employment at-will doctrine, the court rejected the claim. The district court also concluded that even if it applied North Carolina law, North Carolina had no public policy that encouraged employees to investigate one another at company expense. We accept, without deciding, Balevic's contention that North Carolina law applies. We affirm, nevertheless, because we readily agree that Balevic's claim is not an exception to North Carolina's employment at-will doctrine.

4

North Carolina law prohibits employers from firing at-will employees for reasons that violate public policy. Coman v. Thomas Mfg. Co., 381 S.E.2d 445, 447 (N.C. 1989). The Supreme Court of North Carolina in Coman held that:

> [W]hile there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. A different interpretation would encourage and sanction lawlessness, which law by its very nature is designed to discourage and prevent.

Id. (approving and adopting this language contained in Sides v. Duke Univ., 328 S.E.2d 818, 826 (N.C. Ct. App. 1985)). The court noted that "[p]ublic policy has been defined as the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." Id. at 447 n.2. Although the Supreme Court of North Carolina has refused to give a more precise definition of public policy, see Amos v. Oakdale Knitting Co., 416 S.E.2d 166, 169 n.1 (N.C. 1992), **3** one point is clear. The "narrow exceptions" to North Carolina's employment at-will doctrine are "grounded in considerations of public policy designed either to prohibit status-based discrimination or to insure the integrity of the judicial process or the enforcement of the law." Kurtzman v. Applied Analytical Indus., Inc., 493 S.E.2d 420, 423 (N.C. 1997). We find none of those considerations even remotely at play here.

There is absolutely no evidence to suggest, and Balevic does not claim, that Waller discharged him for reporting  criminal violations. Instead he claims Waller discharged him for investigating another employee. We find no public policy or interest of North Carolina

_____

**3** Although it may be tempting to refine [this] definition of "public policy" in order to formulate a more precise and exact definition, we decline to do so. Any attempt to make the definition more precise would inevitably lead to at least as many questions as answers. True to the common law tradition, we allow this still evolving area of the law to mature slowly, deciding each case on the facts before us.

Amos, 416 S.E.2d at 169 n.1.

5

implicated when a corporate employee is discharged for investigating another corporate employee, let alone for investigating an employee in another state on suspicion that the employee under investigation might have violated another state's drug laws. We also note that if Balevic's conduct were as Propst reported to Waller, a report with some credibility given that Balevic surreptitiously recorded Waller, Balevic invaded privacies, sullied reputations, generously hurled accusations and possibly subjected Ithaca to liability. No public policy required Ithaca to fund his activities. The Supreme Court of North Carolina has cautioned that additional exceptions to its employment at-will doctrine "demand careful consideration and should be adopted only with substantial justification grounded in compelling considerations of public policy." Id. We would be ignoring that caution if we were to proclaim the public policy exception Balevic urges. We hold, therefore, that Balevic has failed to state a claim for discharge in violation of North Carolina's public policy.

III.

Balevic claims that Waller and Wehrmann intentionally interfered with his employment contract with Ithaca. The district court found that Balevic had failed to show that Wehrmann interfered. The district court also concluded that Waller was a party to Balevic's contract and, therefore, could not be liable for intentional interference. We conclude, albeit on slightly different grounds, that the district court properly granted summary judgment against Balevic. At best, Balevic showed only that Wehrmann accurately communicated, or caused the accurate communication of, information to Waller, a corporate superior, who then acted on that information. Balevic, therefore, failed to overcome the presumption that Wehrmann and Waller acted in Ithaca's best interests.

In North Carolina, to establish the tort of intentional interference with contract, a plaintiff must prove (1) the existence of a valid contract between the plaintiff and a third party, (2) that the defendant had knowledge of this contract, (3) that the defendant intentionally induced the third party not to perform the contract, (4) that the defendant acted without justification, and (5) that the defendant's act caused the plaintiff damages. Childress v. Abeles, 84 S.E.2d 176, 181-82 (N.C. 1954). Although the Supreme Court of North Carolina has

6

held that corporate officials may be liable for interfering with a contract between the corporation and its employees, see Embree Constr. Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924 ( N.C. 1992); Wilson v. McClenny, 136 S.E.2d 569, 578 (N.C. 1964), corporate officials retain a qualified privilege to "interfere" in this context. See Embree, 411 S.E.2d at 924. This qualified privilege rests upon the presumption that corporate officials act in the best interests of the corporation. Id. at 925. The presumption that these acts "are in the corporation's interest and thus justified is overcome when the means or the officer's motives are improper." Id. at 924. However, a corporate official may be held liable only "where his acts involve individual and separate torts distinguishable from acts solely [sic] on his employer's behalf or where his acts are performed in his own interest and adverse to that of his firm." Wilson, 136 S.E.2d at 578 (citations omitted).

Wehrmann was Ithaca's executive vice-president and second highest ranking corporate officer. He had direct supervisory authority over Frank and Tony Hall, the latter of whom was the target of Balevic's investigation. Wehrmann clearly acted within the scope of his authority when he traveled to Edison in response to the Halls' complaints about Balevic's perceived over zealous investigatory efforts directed at Tony Hall and when he discussed his concerns about Balevic's conduct with Propst. Indeed, we find it wholly incompatible with the proper functioning of a corporation to remove a high ranking corporate official from discourse concerning the employment-related conduct of a corporate employee. But this is precisely what we would be doing if we were to pierce Wehrmann's qualified privilege because he contributed to the accurate reporting of information to Waller. We, therefore, conclude that Balevic has failed to overcome the presumption that Wehrmann acted in Ithaca's best interests. It follows that Wehrmann is not liable for tortious interference with Balevic's contract of employment.

Balevic's claim against Waller fails for similar reasons. Waller is the president and highest ranking officer of Ithaca and had direct supervisory authority over Balevic. Waller terminated Balevic after Propst informed Waller of what he had learned during his trip to Edison. Balevic has suggested, but had no evidence to prove, that Waller terminated him for reasons unrelated to these reports. We thus find that Balevic has failed to overcome the presumption that Waller acted

7

properly when he discharged Balevic. We affirm, therefore, the district court's grant of summary judgment in favor of Waller on this claim.[4]

IV.

As his final claim, Balevic contends that Ithaca breached his shareholders' agreements.[5] Balevic argues that his right to receive a higher price for the shares of his repurchased protected stock was triggered by the merger following his termination. Balevic alleges that Ithaca acquired an outside company, Bestform Foundations, Inc., through a reverse triangular merger involving Ithaca, Ithaca Holdings, and Ithaca Merger, and that this transaction triggered his right to the higher share price. Ithaca responds that the transaction was simply a reorganization into a holding company structure and that Ithaca Merger merged into Ithaca; Ithaca did not merge into Ithaca Merger. The district court found that the plain language of the agreements required Ithaca to pay Balevic the higher price only in the event that Ithaca merged into another company, not the converse, and that the uncon-

---

[4] The district court granted summary judgment on Balevic's claim against Waller on the ground that Waller was a "party" to the contract and a party to a contract cannot be liable for tortiously interfering with that contract. We find it unnecessary to reach the issue.

[5] The language of Balevic's "Bonus Stock Restriction Agreement," signed by Balevic on January 22, 1988, reads as follows:

> [I]f at the time of any repurchase of Shares pursuant to this sentence there exists no public trading market for the Common Stock, but within six months thereafter Ithaca merges into another corporation or sells all or substantially all of its assets and the consideration received by the stockholders of Ithaca exceeds on a per share basis the price received on a per share basis by the Bonus Employee for the Protected Shares, then the Bonus Employee shall receive in respect of the Protected Shares the difference between such per share consideration and the per share price received by the Bonus Employee for the Protected Shares.

The language of Balevic's "Common Stock Subscription and Repurchase Agreement," signed by Balevic the same date, contains identical language, with the exception that the term "Purchaser" is substituted for "Bonus Employee."

8

tradicted evidence showed, in fact, that Ithaca Merger had merged into Ithaca. The district court, therefore, granted summary judgment in favor of Ithaca. We agree and affirm.

Delaware law, which the parties agree applies, mandates that courts interpreting contracts accord words their "plain, ordinary meaning." Gertrude L.Q. v. Stephen P.Q., 466 A.2d 1213, 1217 (Del. 1983). "[I]f a writing is plain or clear on its face, there is no room for interpretation, construction, or a search for the intent of the parties." Klair v. Reese, 531 A.2d 219, 223 (Del. 1987). While extrinsic evidence under Delaware law is admissible to assist in interpreting ambiguous contract terms, see Pellaton v. Bank of New York , 492 A.2d 473, 478 (Del. 1991), such evidence may not be used to create an ambiguity. See Eagle Industries, Inc. v. Devilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997). Furthermore, "[c]ourts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992). Finally, Delaware law will not supply missing terms of a contract. Conner v. Phoenix Steel Corp., 249 A.2d 866, 868 (Del. 1969).

We find that the phrase "merges into," in the context of Balevic's shareholders' agreements, is not ambiguous, and agree with the district court that the plain meaning of this phrase does not encompass the transaction in which Ithaca was involved following the repurchase of Balevic's protected stock.[6] The word "into" is defined as "[a] preposition signifying to the inside of; within. It expresses entrance, or a passage from the outside of a thing to its interior . . . ." Black's Law Dictionary 822 (6th ed. 1990); see also Webster's New World Dictionary 708 (Third College ed. 1988) (defining "into" as meaning "from the outside to the inside of; toward and within").[7] The language of Balevic's stock agreements provided that Balevic's right to a

_____

[6] As we find that the phrase "merges into" is unambiguous, we may not consider the parol evidence submitted by the parties regarding the phrase's meaning. See Pellaton, 92 A.2d at 478.
[7] We note that Delaware courts "have relied upon dictionary definitions to assist in construing the ordinary meaning of words." Vitalink Pharmacy Services, Inc. v. Grancare, Inc., No. 15744, 1997 WL 458494, at *7 (Del. Ch. Aug. 7, 1997).

9

higher stock price would be triggered in the event Ithaca "merges into" another corporation. A review of language used in Delaware statutes and case law indicates that the phrase "merge into" refers most often to the movement of a disappearing corporation into an entity retaining its corporate identity. See, e.g., Del. Code Ann. tit. 8, § 505(c) (corporation finance tax) ("Any refund due to a corporation which has merged into another Delaware domestic corporation shall be credited to the surviving Delaware corporation.") (emphasis added); Sterling v. Mayflower Hotel Corp., 93 A.2d 107, 108 (Del. 1952) ("A formal agreement of merger was entered into on March 14, 1952, providing for the merger of Mayflower (the constituent corporation) into Hilton (the surviving corporation) . . . ."). When placed in context, therefore, the phrase "merges into" in Balevic's shareholders' agreements refers only to transactions in which Ithaca, as the disappearing entity, loses its corporate structure by merging into an entity that retains its corporate identity. In the transaction that transpired after the protected stock repurchase, however, Ithaca did not disappear or move "to the inside" of another corporation. Rather, Ithaca remained as the surviving entity.

Our interpretation of the stock agreements' language is in accord with the conclusions of courts addressing factually similar situations. In Glinert v. Wickes Cos., No. Civ. A. 10407, 1990 WL 34703 (Del. Ch. March 27, 1990), a Delaware court, interpreting a contract under California law, found that a merger in which the subject corporation had been the surviving entity did not implicate a contract provision allowing for the exercise of stock warrants in the event the corporation merged "into" another corporation.[8] In Kirschner Bros. Oil, Inc. v. Natomas Co., 229 Cal. Rptr. 899 (Cal. Ct. App. 1986), Diamond Shamrock Corp. ("Diamond") executed a plan to acquire Natomas Co. ("Natomas"). Natomas' certificate of determination required a majority vote of its holders of preferred stock in order to approve "the consolidation or merger of [Natomas] into any other corporation." Id. at 791-92. The court held that the provision was inapplicable because, although Natomas had been the target corporation, Natomas had

---

8 The Glinert court presumably based its ruling on California law, as the court stated that the subject warrant agreements were governed by California law. See Glinert, 1990 WL 34703, at *5. The court, however, did not specifically cite California precedent in support of its interpretation of the agreements' language. See id. at *7.

remained intact as a corporate entity and the provision applied "on its face to a merger of Natomas into another corporation." Id. at 792 (emphasis added).**9**

For the foregoing reasons, we find that the transaction in which Ithaca Merger merged into Ithaca did not trigger Balevic's right under the shareholders' agreements to receive a higher price for the shares of his protected stock.

V.

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED
_____

**9** Although it is quite possible, as Balevic has argued, that the economic effect would have been the same or similar had Ithaca merged "into" Ithaca Merger, we may not disregard the express language of Balevic's stock agreements to focus on the ultimate economic effect of the merger. In this regard, Rothschild Int'l Corp. v. Liggett Group, Inc., 474 A.2d 133 (Del. 1984), is instructive. In Rothschild , Liggett Group, Inc.'s (Liggett) certificate of incorporation provided that the holders of 7% preferred stock would be paid par value in "the event of any liquidation of the assets of the Corporation." Id. at 136. Another corporation later acquired Liggett via a reverse cash-out merger in which Liggett retained its corporate structure. Id. at 138-39. The plaintiff, a holder of 7% preferred stock, argued that it was entitled to the par value of its stock because "the economic effect of the merger was a liquidation of Liggett's assets `just as if [Liggett] were sold piece meal to [the acquiring corporation].'" Id. at 136. The court defined "liquidation" as "the `winding up of the affairs of the corporation by getting in its assets, settling with creditors and debtors and apportioning the amount of profit and loss.'" Id. (quoting W. Fletcher, Corporation's § 7968 (1979)). The court found that Liggett's merger did not constitute a liquidation, noting that "[c]learly the directors and shareholders of Liggett determined that the company should be integrated with GM, not that the corporate assets be liquidated on a `piece-meal' basis. . . . [W]e must construe Liggett's liquidation provision as written and conclude that the reverse cash-out merger of Liggett did not accomplish a `liquidation' of Liggett's assets." Id. (emphasis added). Thus, the Delaware court looked to the literal nature of the transaction, not its economic effect. Similarly, we look to the literal nature of the transaction, not to its economic effect.

11