**Joseph S. NORMAN, II, Plaintiff,**

v.

**TRADEWINDS AIRLINES, INC., Defendant.**

**No. 1:02 CV 918.**

United States District Court, M.D. North Carolina.

Aug. 21, 2003.

---

6. The severability clause in *Chacon* is identical to the clause in the policy issued by Standard Fire.

## ORDER

OSTEEN, District Judge.

On March 24, 2003 and June13, 2003, in accordance with 28 U.S.C. § 636(b), Recommendations of the United States Magistrate Judge were filed and notices were served on Plaintiff and copies were given to the court.

Within the time limitation set forth in the statute, Plaintiff objected to the Recommendations.[1]

The court has appropriately reviewed the portions of the Magistrate Judge's reports to which objections were made and has made a de novo determination which is in accord with the Magistrate Judge's reports. The court hereby adopts the Magistrate Judge's Recommendations.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss [Pleading no. # 10] be **GRANTED** in that Plaintiff failed to state a claim for breach of contract, promissory estoppel or fraudulent inducement. A judgment dismissing this action will be entered contemporaneously with this Order.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

DIXON, United States Magistrate Judge.

This matter comes before the court on the Motion to Dismiss [Doc. # 10] of Defendant TradeWinds Airlines, Inc. ("TradeWinds"). Plaintiff Joseph S. Norman, II, filed suit in this case against TradeWinds alleging breach of contract and fraudulent inducement following the

---

1. The court notes that, in connection with Plaintiff's objections to the June 13, 2003, Recommendation, Plaintiff has filed a document styled Motion For Leave To Amend Complaint (docket 29). Unfortunately, Plaintiff has failed to include a proposed amended complaint for the court's review or for Defendant's review with this filing, and the motion is DENIED.

termination of his employment with Trade-Winds. For the reasons that follow, TradeWinds' motion should be granted.

**Factual and Legal Allegations**

Before outlining the factual allegations in Norman's case, it is necessary to address the various sources of factual material presented to this court at this stage of the case. Norman has attached several documents to his response to the motion to dismiss, some of which are referenced in, but not attached to, his complaint, (*e.g.*, a memorandum dated April 25, 2000, the TradeWinds Airlines Flight Deck Crew Policy Handbook, and a letter of termination dated August 15, 2002), and some of which are not directly referenced in his complaint (*e.g.*, a memorandum dated April 10, 2001, and a memorandum dated August 15, 2002). *See* Am. Compl. [Doc. # 3, hereinafter "complaint" or "Compl."]. Norman has also made several additional substantial factual allegations in his response to the motion to dismiss which are not in the complaint. (*E.g.*, Resp., pp. 3–4 (concerning travel and training requirements of job)).

Generally, on a motion to dismiss, courts are limited to consideration of the facts stated in the complaint or in documents attached to the complaint, and consideration of facts outside the complaint converts the motion to dismiss into a motion for summary judgment. *See* FED.R.CIV.P. 12(b) & 10(c). The underlying concern in cases applying this rule is to protect a *plaintiff* who might not have notice of (and an opportunity to fully respond to) facts newly introduced by the *defendant* in conjunction with motion of dismissal. *See McNair v. Lend Lease Trucks, Inc.*, 62 F.3d 651, 656 (4th Cir.1995), *vacated on other grounds by* 95 F.3d 325 (4th Cir. 1996); *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2nd Cir. 1991). Accordingly, an exception to the rule exists in two situations where this

concern is not at issue. First, courts have considered the contents of documents not attached to the complaint, but brought forth on a motion to dismiss, where the documents are referred to in the complaint and are central to the plaintiff's claim. *See, e.g., Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir.2000) (considering document whose contents were alleged in the complaint); *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir.1999) (considering insurance document attached to motion to dismiss); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 259 (3rd Cir.1998) (considering documents produced upon motion to dismiss). Second, courts have also considered facts not alleged in the complaint where the plaintiff has himself raised the fact outside of the complaint. *See McNair v. Lend Lease Trucks, Inc.*, 62 F.3d 651, 656 (4th Cir. 1995) (allowing consideration of a crucial fact not alleged in the complaint, without converting motion to one for summary judgment, where plaintiff recognized fact in argument on motion to dismiss), *vacated on other grounds by* 95 F.3d 325, 328 n. 3 (4th Cir.1996) (expressly adopting reasoning of panel as to this point); *Early v. Bankers Life & Casualty Co.*, 959 F.2d 75, 79 (7th Cir.1992) ("[A] plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved ... would entitle him to judgment.").

In this case, given that it is Norman who has introduced additional documents and facts beyond those in the complaint into the record, and given that TradeWinds does not take issue with the court's consideration of these additional documents and facts, the court will consider all of the documents and accept as true the facts included with Norman's response, whether

directly referenced in the complaint or not. With the documentary exhibits present, though, the court need not accept as true any allegations in the complaint (or the response) that are directly contradicted by the exhibits. *See Fayetteville Investors v. Commercial Builders, Inc.,* 936 F.2d 1462, 1465 (4th Cir.1991) ("[I]n the event of conflict between the bare allegations of the complaint and any [attached] exhibit ... the exhibit prevails."); *see also Sprewell v. Golden State Warriors,* 231 F.3d 520, 528 (9th Cir.2000) (holding that, by attaching arbitration agreement to complaint, the plaintiff "pled himself out of a claim by including unnecessary details contrary to his claims"). Guided by these principles, the facts of Norman's case and the allegations supporting Norman's claims may be summarized as follows.

Norman is a citizen of Florida, and TradeWinds is a corporation with its headquarters in Greensboro, North Carolina. (Compl., ¶ 1). Norman was recruited by TradeWinds in Florida, and was employed with TradeWinds as a pilot on or before March 26, 2001. (Resp., ¶ 26, Ex.1). Norman's employment was *not* pursuant to a contract which provided for a definite period of employment. (Resp., ¶ 5). Norman signed an "Acknowledgement of Conditional Offer of Employment" which stated that Norman agreed that "his employment may be terminated 'with or without cause or notification, at any time.'" (Compl., ¶ 16).[1]

At the time of Norman's interview and employment, TradeWinds made Norman aware of company guidelines, policies, and "the details of the employment opportunity offered," which were embodied in an April 25, 2000, Memorandum, the TradeWinds "Flight Deck Crew Policy Handbook" ["Handbook"], and an April 10, 2001, Memorandum. (Compl., ¶ 3; Resp., ¶ 3; Pl's Resp. to Reply, p. 2). At the start of his employment, Norman signed a statement indicating that he acknowledged that he had received a copy of the Handbook and that it was his "responsibility to read ... and be responsible to company policies there-in." (Ex. 1; Resp., ¶ 9). The April 25, 2000, Memorandum (from TradeWinds' President to "All Cockpit Crewmembers") was attached to the Handbook, and it stated, in part:

> This handbook will be the basis on which a flight deck crewmember's day-to-day interaction with the company will be managed....
>
> The company ... appreciates the dynamic nature of its current situation. Especially in light of the negative effects its prior financial performance has had on its overall financial strength. [sic] The policies in this initial copy of the handbook may be revised from time to time as dictated by the operational needs of the company.

(Ex. 1).

The Handbook itself outlined, inter alia, an "Off–Day" pay policy (Ex. 1, Handbook, p. 4); a "Hot Reserve" pay credit policy for each full day of "Hot Reserve Duty" (Ex.1, Handbook, p. 5); a priority policy for awarding "Open Time" (Ex.1, Handbook, p. 5); and a seniority policy for assigning captain positions (Compl., ¶ 6). The Handbook also outlined "Standby Pay" and other upgrading and seniority policies or procedures. (Resp., ¶ 24; *see also* Ex. 1, Handbook, p. 10 ("Seniority will be used for awarding lines of flying, upgrading, downgrading, training, furloughing, and giving preference for assigning open Time, extra sections and other flying. [sic] ... Normally, the seniority of a pilot shall be assigned by the company upon successful completion of Basic Indoctrination training[.]")).

---

1. Norman describes and quotes this document in his complaint but neither he nor TradeWinds includes a copy of this document in the record.

In addition, the Handbook included a "Progressive Discipline Policy" which provided guidelines under which a Chief Pilot or Director will take disciplinary action "if a crewmember commits an offense warranting disciplinary action." (Ex.1, Handbook, p. 14). These guidelines provided for a three-step warning process for most offenses, followed by suspension or termination. (*Id.*). "In cases of major offenses," however, "disciplinary action may start at any level of this progressive discipline program." (*Id.*). Finally, the April 10, 2001, Memorandum, contained a policy statement on the part of TradeWinds outlining the "enumerated procedure in terminating employees." (Pl's Resp. to Reply, p. 2). Specifically, the Memorandum indicates that when the TradeWinds scheduling department is "Unable to Contact (UTC)" a crewmember, sanctions will occur. (Ex. 2). One UTC results, inter alia, in a write up; a second UTC results in a meeting with the Chief Pilot in Greensboro, North Carolina; and, a third UTC results in a further meeting with the Chief Pilot in Greensboro and possible discontinuation of employment. (Ex. 2, p. 2).

While employed with TradeWinds, "Norman was required to move from Florida to Dayton, Ohio, each time he began a work shift." (Resp., ¶ 6). This travel time to reach the point of origination for the flights assigned was uncompensated. (*Id.*). "As a condition of employment," Norman was required to complete "Basic Indoctrination training." (Resp., ¶ 7; *see* Ex. 1, Handbook, p. 10). During the training program, which lasted several months, Norman was "required ... to start at a much reduced level of pay and progress through a seniority system." (Resp., ¶ 7). Also, "Norman was required to agree to an 'Equipment Lock' to work for Trade-Winds," in which he was "required to stay in an aircraft type" for about 36 months before seniority allowed greater choice. (Resp., ¶ 8; Ex. 1, Handbook, p. 11).

During the course of Norman's employment, TradeWinds did not apply the "Off-Day," "Hot Reserve," "Open Time," "Standby Pay" and other upgrading and seniority procedures outlined in the Memoranda and Handbook. (Compl., ¶¶ 4–7; Resp., ¶ 24). Norman's employment was "terminated for cause" by a letter, dated August 15, 2002. (Compl., ¶ 7). Prior to this termination, Norman was not given three warnings pursuant to the Handbook "Progressive Discipline Policy." (Resp., ¶ 24). The termination letter, from Bruce Clamp, Chief Pilot, stated, in part,

> [t]his letter is to serve you notice that in response to your failure to be available for an assignment, therefore missing a trip sequence, you are hereby terminated. . . .
>
> It was very apparent in our conversation that you purposefully and willfully avoided contact with the Crew Scheduling Department. Numerous calls had been placed to your home with messages left, and emails had also been sent. . . .
>
> Your attitude toward your responsibility to the schedule that was duly awarded to you in the bidding process is unacceptable and falls well short of what we expect and need from our employees . . . . [W]e do not have the luxury of being able to risk the possibility of canceling or delaying a flight because of an adverse attitude of one of our employees.

(Ex. 3). The letter was written on Trade-Winds stationary, providing a North Carolina company contact address and phone number, and was addressed to Norman at a Tallahassee, Florida, mailing address. Norman notes in his Complaint that "the termination occurred immediately after a conversation that related to Plaintiff's interest in the potential for the establishment of a Union or bargaining organization to protect the rights of pilots."

(Compl., ¶ 17). Following Norman's termination, "The Florida Unemployment Compensation Office" determined that Norman had been discharged for a "reason other than misconduct connected with the work." (Compl., ¶ 15; Ex. 5). Upon notification of this determination, TradeWinds provided the Florida agency "a document that purports to amend the Handbook with respect to the policy on work schedule." (Compl., ¶ 15).

Norman alleges (in Count One of his complaint) that the Handbook and April 2000 Memorandum stated the "promises, conditions and rules" of his employment and created a "written contractual agreement" between Norman and TradeWinds. (Compl., ¶ 3). He alleges that TradeWinds' failure to follow the procedures in the Handbook during his employment constitute a breach of contract. (*Id.*). He also contends that the Handbook as well as the 2000 and 2001 Memoranda created an "implied promise" that he would not be terminated except in accordance with the seniority provisions or the progressive discipline procedure. (Compl., ¶ 7–8; Resp., ¶ 5; Pl's Resp. to Reply, p. 2). Because TradeWinds did not follow the termination policies embodied in these documents, Norman therefore alleges that his termination was a breach of contract. (*Id.*). Norman contends that he provided valuable consideration in return for his employment with TradeWinds, namely that he had to move each time he began a work shift, he had to participate in training at reduced pay, and had to participate in an "equipment lock." (Resp., ¶ 6).

Norman also alleges (in Count 2 of his complaint) that, "by using the Handbook and Memorandum as promises of the details of the employment opportunity offered," TradeWinds "fraudulently induced" Norman to enter into employment with the company. (Compl., ¶ 9). In particular, Norman alleges that TradeWinds "created, with the Handbook, the appearance of a favorable employment agreement to recruit pilots," (Compl., ¶ 17), and that TradeWinds knew of "intended or possible changes in the employment conditions" and failed to inform Norman of this knowledge at the time of employ. (Compl., ¶ 9). As such, "TradeWinds committed fraud by concealing information that was material to the employment transaction." (Compl., ¶ 18; *see also* ¶ 17) ("The use of the Handbook to recruit Plaintiff Norman represents fraud."). As a result, when TradeWinds failed to abide by the promises set out in the Handbook, Norman experienced a "substantial diminishment of the financial and professional returns that Norman reasonably expected from the representations made by TradeWinds in the Memorandum and Handbook." (Compl., ¶ 14).

**Motion to Dismiss Standard**

The purpose of a motion to dismiss, under Federal Rule of Civil Procedure 12(b)(6), is to test the legal sufficiency of the complaint, not to resolve conflicts of fact or to decide the merits of the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (1999). The court may dismiss a complaint for failure to state a claim only if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). Nevertheless, while the court must take the facts in the light most favorable to the plaintiff, the court "need not accept the

legal conclusions drawn from the facts [or] ... unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir.2000); *see also Labram v. Havel,* 43 F.3d 918, 921 (4th Cir.1995) (stating that the court is not required to accept "conclusory allegations regarding the legal effect of the facts alleged"). In this way, a motion to dismiss "allows a court to eliminate actions that are fatally flawed in their legal premises." *Parham v. Pepsico, Inc.,* 927 F.Supp. 177, 178 (E.D.N.C.1995).

## Discussion

### I. Choice of Law

As a federal court sitting in diversity, this court must apply the choice-of-law rules of the forum state, North Carolina. *Wells v. Liddy,* 186 F.3d 505, 521 (4th Cir.1999); *Liberty Mutual Ins. Co. v. Triangle Indus., Inc.,* 957 F.2d 1153, 1156 (4th Cir.1992). Under North Carolina's choice of law rules, the interpretation of a contract is governed by the law of the place where the alleged contract was made. *Rhone–Poulenc Agro S.A. v. Monsanto Co.,* 73 F.Supp.2d 554, 556 (M.D.N.C.1999) (quoting *Tanglewood Land Co. v. Byrd,* 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980)). For actions sounding in tort law, such as fraud, the law of the "place of the wrong" controls. *Id.* (quoting *Boudreau v. Baughman,* 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988)). In a fraud claim, the place of the wrong is the locale in which the injury to the plaintiff occurs, i.e., where the loss is sustained, not where alleged fraudulent representations are made. *Id.*

Regarding the contract claim in this case, there is some disagreement as to the which state's law should apply. In his complaint, Norman indicates that he is a citizen of Florida and that Tradewinds has its principal place of business in Greensboro, North Carolina. (Compl., ¶ 1). In his brief, Norman contends that he was "recruited in Florida," and that it was in Florida that Norman was allegedly given representations by TradeWinds concerning the terms of his employment during this "recruitment phase." (Resp., ¶ 26). At the same time, Norman points out that his termination occurred in Ohio, that Ohio was his assigned base for his work, and that therefore Ohio was "the principal site of the action that engendered this case." (Resp., ¶ 12). On its own assessment, TradeWinds contends that "it is undisputed that Plaintiff was hired, directed, and fired from Tradewinds headquarters in Greensboro, [North Carolina]." (Reply, p. 5). In discussing his contract claim, Norman urged the court to apply Ohio law, (Resp., ¶¶ 12–16), and TradeWinds urged the court to apply North Carolina law. (Reply, p. 5 n. 2). Nevertheless, both Norman and TradeWinds discussed the application of both Ohio law and North Carolina law to the contract claim.

Based on Norman's own factual allegations and the attached exhibits, this court finds that either Florida or North Carolina law should apply to Norman's contract claims. Contrary to Norman's argument, the state law which most certainly has no bearing on the contract claims is Ohio law, because, by Norman's own admission, Ohio was the location of his *termination* and assigned base of operations. Norman has made no allegation that indicates that Ohio was where the contract was made. Rather, Norman's allegations and papers show that any alleged contract would have been made either in Florida (where Norman was recruited) or in North Carolina (where documents and communications forming the alleged contract from the company originated). At this point, given that the law of either North Carolina or Florida is of plausible applicability on the basis of the facts alleged, *see Tanglewood Land Co.,* 299 N.C. at 262, 261 S.E.2d at 656, the

court will test Norman's claims against the law of both states.

In discussing fraud claim, both Norman and TradeWinds applied both Florida law and North Carolina law. Given the mixed evidence in the record regarding the "place of the wrong" in this case, the court cannot rule out the application of Florida and North Carolina law to the Fraud claim. Norman's termination letter is addressed to a Florida address, and it includes a North Carolina return address, as well as references to discussions that may or may not have occurred in North Carolina. At the same time, the court is mindful that Norman emphasized in his brief that his termination occurred while he was in Ohio, and that it was in Ohio that was "the principal site of the action that engendered this case." (Resp., ¶ 12). To be safe, the court will evaluate Norman's fraud claims under the law of all plausibly applicable jurisdictions, in this case, North Carolina, Florida and Ohio. *See Rhone–Poulenc Agro S.A.,* 73 F.Supp.2d at 556.

## II. Contract Claim

### A. Under North Carolina law

 Under North Carolina law, employment is at-will. *See Kurtzman v. Applied Analytical Indus., Inc.,* 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997). Unless the employer and employee have entered into a contract specifying a definite term of employment, the employment relationship "is presumed to be terminable at the will of either party without regard to the quality of performance of either party." *Id.*

 In this case, Norman concedes that no employment contract specified a definite term of employment. (Resp, ¶ 5). Nevertheless, Norman alleges that a contract guaranteeing certain rights and job security was created through representations made by TradeWinds at the time of his employ. Specifically, he contends he was "interviewed and employed" by TradeWinds "under the terms" of the Handbook and April 2000 Memorandum. (Compl., ¶ 3). These documents, he alleges, stated the "promises, conditions and rules" of his employment and created a "written contractual agreement" between Norman and TradeWinds. (Compl., ¶ 3). He also argues that the Handbook and the 2000 and 2001 Memoranda created an "implied promise" that he would not be terminated except in accordance with the seniority provisions or the progressive discipline procedure. (Compl., ¶ 7–8; Resp., ¶ 5; Pl's Resp. to Reply, p. 2).

 While the court will accept the factual allegation that Norman was interviewed and employed "under the terms" of the memoranda and Handbook, the court need not accept Norman's legal conclusion that the terms of the memoranda and Handbook constituted a written or implied contractual agreement between Norman and TradeWinds. *Eastern Shore Mkts., Inc.,* 213 F.3d at 180; *Labram v. Havel,* 43 F.3d at 921. Under North Carolina law, an employee handbook or policy manual does not create a contractual agreement between employer and employee. *See Walker v. Westinghouse Electric Corp.,* 77 N.C.App. 253, 259, 335 S.E.2d 79, 83–84 (1985). Only if the terms of the handbook are expressly incorporated into a separately existing employment contract will the terms of the handbook become legally binding. *Id.* (citing *Smith v. Monsanto Co.,* 71 N.C.App. 632, 322 S.E.2d 611 (1984)); *see Salt v. Applied Analytical, Inc.,* 104 N.C.App. 652, 656–57, 412 S.E.2d 97, 99 (1991) (citing *Rosby v. General Baptist State Convention,* 91 N.C.App. 77, 81, 370 S.E.2d 605, 608 (1988) (holding that manual received at point of hire, which included conditions of employment, expected conduct of the employer *and* employee, and procedures to be followed for disciplin-

ary actions, was not binding because it was not expressly included within employee's oral terminable-at-will contract)).

▪ In order to find a handbook "expressly incorporated" into a contract, North Carolina courts require language that unmistakably indicates such incorporation. For example, in *Walker*, the court found that the following passage was not sufficient to incorporate a handbook into an employment at will contract:

> This handbook is *our agreement* on how we will operate our business. Read through it and *discuss it with your supervisor. Then it will become more than a handbook . . . it will become an understanding.*

77 N.C.App. at 255, 335 S.E.2d at 80 (syllabus) (emphasis added). The court reasoned that although the handbook promised to become an "understanding," this language was not sufficient to incorporate the handbook into any existing employment at will contract. *Id.* at 260, 335 S.E.2d 79; *see also Rosby*, 91 N.C.App. at 81, 370 S.E.2d at 608 (finding that although manual was presented as the employee's "work bible" when he was hired, the manual was not expressly included within his at-will employment contract).

In this case, even assuming that the terms of the Handbook and memoranda created an understanding that Norman would only be treated according to certain scheduling and seniority policies or terminated according to the progressive disci-

pline policy, this understanding was never expressly incorporated into a contract, and was thus not binding on TradeWinds. In the first place, Norman does not allege in his complaint that any employment contract existed apart from the Handbook and memoranda. Rather, he contends that the Handbook and the memoranda were, themselves, the contract which governed his terms of employment. (Compl., ¶ 3). But, under *Walker*, for employee guidelines to become a contract they must be incorporated into another separately existing contract. Thus, an agreement embodied only in the Handbook and memoranda is insufficient to establish a binding employment contract. *Walker*, 77 N.C.App. at 259, 335 S.E.2d at 83–84; *see also Farris v. Tubular Textile, LLC*, No. 1:01 CV 984, 2002 WL 1150724, *2 (M.D.N.C. May 24, 2002) (applying North Carolina law and finding, first, that plaintiff cannot rely on employee handbook alone to state a claim for breach of contract, and secondly that provisions of handbook could not have been Incorporated by reference into another contract because plaintiff never alleged that any contract existed separately from the handbook).

Moreover, even if the court accepts that an employment contract was existing apart from the Handbook and memoranda in Norman's case, (in the form of an oral contract of unspecified term, for example),[2] neither the Handbook nor the memoranda are *expressly incorporated* into this contract. First, there is no provision in the

---

2. Norman argues in his brief that either written or verbal representations may contribute to the terms of an employment contract. (Resp., ¶ 15). He notes that an employee manual "sets forth some, or all, of the terms and conditions of" the employment contract otherwise entered into by the parties. (Resp., ¶ 15). Although Norman makes no such allegation in his complaint, he appears to allege by this discussion that he and TradeWinds also entered into a contract separate from the handbook. Nevertheless, Norman gives no explicit indication as to whether any verbal promises were made in his case or what these verbal representations may have been. (*See* Resp., ¶ 15). In any event, the claim that a contract (oral or otherwise) existed separately from the Handbook and Memoranda is inconsistent with the allegation in his complaint that "the Memorandum and the Handbook *created* a *written* contractual agreement," and that the employment contract was "*defined by* the Memorandum and the Handbook." (Compl., ¶¶ 3, 8) (emphasis added).

Handbook indicating that the Handbook is a part of any other contract. (*See* Ex. 1). Nor is there any provision in the Handbook incorporating its terms into any other contractual document or agreement between TradeWinds and any employee, much less Norman in particular. (*See* Ex. 1). The April 2000 memorandum does not alter the status of the Handbook, indicating only that "this handbook will be the basis on which a flight deck crewmember's day-to-day interaction with the company will be managed.... The *policies* in this initial copy of the handbook *may be revised from time to time as dictated by the operational needs of the company.*" (Ex. 1) (emphasis added). Finally, the text of the April 2001 Memorandum, concerning further policy guidelines for discipline, contains no statement incorporating such guidelines into any separate contract between TradeWinds and Norman. If anything, through the combination of the memoranda and the Handbook, TradeWinds has clearly indicated that it might unilaterally alter any policies in the Handbook at any time.[3] Accordingly, Norman cannot establish, under the facts alleged, that the understandings communicated through the Handbook and memoranda, alone or in conjunction with other oral representations, constituted a contract binding on TradeWinds.

Norman argues that his case should be aligned with *Trought v. Richardson*, 78 N.C.App. 758, 338 S.E.2d 617 (1986), in which the court reversed dismissal on a wrongful discharge claim, on the basis that a policy manual had become a part of the employee's employment contract. In *Trought*, the policy manual of the plaintiff's employer explicitly provided that she could "*only* be discharged *for cause.*" 78 N.C.App. at 762, 338 S.E.2d at 619. The plaintiff alleged that she was wrongfully discharged because she was discharged "*without cause.*" *Id.* The holding in *Trought* has been strictly construed by North Carolina courts. For example, in *Harris v. Duke Power Co.*, 319 N.C. 627, 631, 356 S.E.2d 357, 360 (1987), the North Carolina Supreme Court limited the holding in *Trought* to the facts of that case, emphasizing that in *Trought* the policy manual provided that "employees could be discharged *only* for cause," and that the plaintiff in *Trought* had been discharged without cause. *Id.* (emphasis added). Norman's case is squarely distinguishable from *Trought* on both fronts emphasized by *Harris.*[4] First, although Norman attempts to argue that the progressive discipline policy and seniority provisions combined by implication to suggest he could only be terminated for cause, there was no express representation in the Handbook, as in *Trought*, that Norman could be terminated "only for cause." Second, in this case, Norman was, by his own admission, terminated "for cause." (Compl., ¶ 7).[5]

---

**3.** Norman points out that the handbook, itself, was never revised during his period of employ. (Resp. to Reply, p. 1). That may be true, but the memorandum provides that the *policies* in the handbook may be revised as dictated by the operational needs of the company from time to time. It does not indicate that the handbook, itself, would necessarily be revised upon a change in policy.

**4.** Norman argues that the *Harris* decision is distinguishable from his case because, unlike the TradeWinds handbook, the employment manual in *Harris* only set out a management procedure and set forth no rules for employ-

ees to follow. (Resp., ¶ 19). This may be true, but regardless of this difference in the facts of *Harris*, that case is useful insofar as it provides the relevant legal rules and sheds light on the limitations of the holding in *Trought*. Furthermore, even if the handbook does set out rules for both the employer and employees to follow, this does not transform the handbook into a binding contract. *See Salt*, 104 N.C.App. at 656–57, 412 S.E.2d at 99 (discussing facts of *Rosby* case).

**5.** Norman states in his complaint that he was "unilaterally terminated for cause by a letter of August 15, 2002." (Compl., ¶ 7). Indeed,

Furthermore, in his complaint, Norman does not bring a claim for wrongful discharge (as the plaintiff in *Trought* did) but only for breach of contract for failure to follow the disciplinary guidelines of the employer manual. Thus *Trought* is inapposite.

The mere claim that TradeWinds did not follow its guidelines for disciplinary action when terminating Norman, (Resp., ¶ 20, p. 10), is insufficient to place Norman's case within the rule of *Trought*. Rather such a claim is properly analyzed pursuant to case law providing that an employer's failure to follow termination guidelines in an employer manual, in itself, does not state a cause of action. *See Harris*, 319 N.C. at 631, 356 S.E.2d at 360 (finding that although a manual provided progressive discipline policy, no promise or representation was made that the employee could be subject to dismissal *only* according to that policy); *Salt*, 104 N.C.App. at 656, 412 S.E.2d 97 (finding no claim despite allegation that, in violation of procedure in manual, company did not give requisite verbal or written notice prior to termination); *Williams v. Biscuitville, Inc.*, 40 N.C.App. 405, 408, 253 S.E.2d 18, 20 (1979) (stating that failure to follow progressive guidelines for disciplinary action prior to termination, as set out in an employment manual that had induced the plaintiff to stay with company, did not state a claim for breach of contract; and finding that employer could discharge employee in manner not set forth in manual). In Norman's

case, as in these cited cases, there is no provision that the disciplinary policies outlined in the manual are the *only* procedures allowed upon termination. Indeed, in Norman's case, the Handbook allowed for discretion on the part of TradeWinds in determining whether a disciplinary infraction was "major," in which case the guidelines of the handbook would not apply. (Ex.1, Handbook p. 14). ·Furthermore, the non-binding, discretionary, nature of the Handbook is brought to light by the fact that TradeWinds indicated that "the policies in this initial copy of the handbook may be revised from time to time as dictated by the operational needs of the company," thus leaving open the possibility that an employee might be terminated according to a different policy at the discretion of the company. (Ex. 1). The default level of discretion retained by the company is also reinforced by the signed statement by Norman recognizing that "his employment *may* be terminated 'with or without cause *or notification*, at any time.'" (Compl., ¶ 16) (emphasis added).

 Distinguishing his case from *Harris*, Norman claims that a contract existed on the theory that he provided consideration in exchange for TradeWinds' "implied promise" to follow the policies embodied in the Handbook and memoranda at the time of his employ and termination. (Resp., ¶¶ 6, 15, & 18; Resp. to Reply, p. 2). In certain limited circumstances, special consideration may serve to enforce

the letter itself gives a reason for Norman's termination, namely that the company had been unable to contact him on numerous occasions, thus risking the possibility of canceling or delaying a flight. (Ex. 3). In his brief, Norman contends that the "actual 'cause' of termination is uncertain." (Resp., ¶ 11). He also points out that "the termination occurred immediately after a conversation that related to Plaintiff's interest in the potential for the establishment of a Union or bargaining organization to protect the rights of pilots."

(Compl., ¶ 17). Norman does not, however, allege that TradeWinds terminated him for union activities, nor does he bring a cause of action on the basis of wrongful discharge in violation of state law (*e.g.*, N.C. GEN. STAT. §§ 95–81, –83 (providing for recovery for person terminated because of union membership)). Indeed such a claim would have to proceed on a theory wholly divorced from the breach of contract claim which he now argues before the court.

"contracts that attempt to provide for permanent employment, or 'employment for life,'" which are, generally, terminable at will by either party. *Kurtzman v. Applied Analytical Industries, Inc.*, 347 N.C. 329, 332, 493 S.E.2d 420, 422 (1997) (quoting rule as stated in *Burkhimer v. Gealy*, 39 N.C.App. 450, 454, 250 S.E.2d 678, 682 (1979)). This rule was originally announced by the North Carolina Court of Appeals and has since been specifically disapproved by the Supreme Court of North Carolina.[6]

■ Even when followed, the rule's application is limited to a narrow set of circumstances, namely where 1) an employer has made an express promise of permanent employment or termination only upon incompetence, *and,* 2) the employee, in reliance on this promise, gave additional consideration, such as "relinquishing a claim for personal injuries against the employer, *removing his residence* from one place to another in order to accept employment, or assisting in breaking a strike." *See id.* at 332 & 333, 493 S.E.2d at 422 & 423 (quoting *Burkhimer*, 39 N.C.App. at 454, 250 S.E.2d at 682, and *Sides v. Duke University*, 74 N.C.App. 331, 345, 328 S.E.2d 818, 828 (1985)). For example, in *Sides,* where an employee had moved her residence from Michigan to Durham in reliance on express promises that she "could only be discharged for incompetence," the North Carolina Court of Appeals found that the employee had provided valuable consideration sufficient to

overcome the at-will presumption. *Sides,* 74 N.C.App. at 345, 328 S.E.2d at 828. In contrast, in *Kurtzman,* the North Carolina Supreme Court declined to find an enforceable contract where an employee moved his residence from Rhode Island to North Carolina based on assurances that "'If you do your job, you'll have a job'; 'This is a long-term growth opportunity for you'; 'This is a secure position'; and 'We're offering you a career position.'" 347 N.C. at 331, 493 S.E.2d at 421. *See also Salter v. E & J Healthcare, Inc.,* 155 N.C.App. 685, 575 S.E.2d 46, 53–54 (2003) (recognizing that *Sides* was "overruled" by *Kurtzman* ); *McMurry v. Cochrane Furniture Co.,* 109 N.C.App. 52, 56 & 57, 425 S.E.2d 735, 738 (1993) (stating that the additional consideration exception has been "narrowly construed," and noting its limited application in *Sides* ).

■ In this case, Norman's claim based on a theory of consideration fails, first, because he has not alleged proper consideration and, secondly, because he has not alleged any express promise of termination only for cause. Norman contends that he provided valuable consideration in return for his employment terms with TradeWinds, because he had to 1) travel, on his own time, to the point of origination of the flights assigned each time he began a work shift, 2) participate in training at reduced pay, and 3) abide by the "equipment lock" and other policies in the Handbook. (Resp., ¶ 6–9). He also claims that his "commercial pilot certifi-

---

**6.** *See id.* at 333, 493 S.E.2d at 423 (stating that "plaintiff's contention that this exception is well established in our jurisprudence is incorrect; this Court has not heretofore expressly passed upon it;" and providing that the rule as stated by *Burkhimer* "is also disapproved"). In this posture, this basis for breach of contract is of questionable value, at most, in this diversity case. *See Liberty Mutual Ins. Co. v. Triangle Indus., Inc.,* 957 F.2d 1153, 1156 (4th Cir.1992) ("[A] federal court sitting in diversity has a duty to apply the operative state law as would the highest court of the state in which the suit was brought.... [T]he state's intermediate appellate court decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise."). The court need not resolve the status of this rule as announced by the Court of Appeals, for it is, even on its own terms, unhelpful to Norman's case.

cate" served as additional consideration. (Resp., ¶ 18). Norman's claim must be rejected on the basis of his own allegations, however, because none of these activities qualify as "additional consideration" under North Carolina law. Rather, each of these activities were part of the "usual obligation of service" with Trade-Winds. *Walker*, 77 N.C.App. at 260–61, 335 S.E.2d at 84; *see also Swanson v. Chem–Nuclear Sys.*, No. 5:96–CV–674–BO(3), 1997 U.S. Dist. LEXIS 16054, *5 (E.D.N.C. Sept. 15, 1997) (stating that "sacrifices [that] are simply part and parcel to accepting employment with a particular employer ... do not warrant application of this exception") (citing *Humphrey v. Hill*, 55 N.C.App. 359, 362–63, 285 S.E.2d 293, 296 (1982)). Unlike the plaintiff in *Sides*, Norman was not required to move his residence in order to accept employment with the company. Rather, Norman was required to travel on a regular basis, as a part of his job, to the location of the start of his work shift. He was required to travel in this manner "each time he began a work shift." (Resp., ¶ 6). The training program was also part of the obligation of service with the company, which he carried out *as an employee* for Trade-Winds, and for which he received compensation. (Resp., ¶ 7).[7] Additionally, the requirement of an equipment lock and other policies, were, again, part of the obligation of service with the company. (Resp., ¶ 8). Finally, the fact that Norman was credentialed with a commercial pilot certificate is not something that Norman was offering in addition to his employment with the company, much less something that Norman could withhold or not withhold in return for the promises in the Handbook.

As such, none of these activities or requirements amount to recognized "additional consideration" under North Carolina law.

■ Second, Norman has alleged only that the Handbook and memoranda amounted to "implied promises" that the company would follow certain procedures during employment and for discipline or termination. (Resp. to Reply, p. 2). Nowhere in these documents did TradeWinds expressly indicate that Norman could be terminated only for cause, as was the case in *Sides*, nor has Norman indicated that TradeWinds orally assured him that he would not be terminated except for cause. As Norman himself points out, Trade-Winds expressly indicated that "his employment may be terminated 'with or without cause or notification, at any time.'" (Compl., ¶ 16). Accordingly, Norman's has failed to allege facts which would show that the handbook contained any express promises of permanent employment which could be supported by additional consideration. Thus his claim is not cognizable under the "additional consideration" exception in North Carolina law.

■ Norman also urges the court to proceed on a theory that promissory estoppel may serve to modify an oral employment-at-will contract, if an employer makes representations upon which an employee could reasonably be expected to rely on as a promise for continued employment. (Resp., ¶ 13) (citing *Pond v. Devon Hotels, Ltd.*, 55 Ohio App.3d 268, 270, 563 N.E.2d 738, 741 (1988) (recognizing applicability of promissory estoppel where employee reasonably relies on oral promises

---

**7.** The fact that the compensation was reduced, as Norman claims, does not transform attendance in the training program into valuable consideration. *See e.g., Swanson*, No. 5:96–CV–674–BO(3), 1997 U.S. Dist. LEXIS 16054 at *6 (emphasizing that consideration must be "above and beyond simply showing up for work each day, [or] foregoing other employment opportunities that, in hindsight, may have been a better choice, ... [or taking] a significant reduction in pay.").

of continuing employment given by employer)). The doctrine of promissory estoppel is an equitable doctrine wherein a party that has reasonably relied on the promise of another may enforce the promise, absent valuable consideration, in order to avoid injustice. *Forstmann v. Culp,* 648 F.Supp. 1379, 1384 n. 3 (M.D.N.C.1986) (quoting Restatement 2d of Contracts, § 90). "Even if all of the elements for a promissory estoppel are present, the plaintiff will lose unless a given jurisdiction accepts promissory estoppel as a substitute for consideration under the facts of a particular case." *Id.* at 1385 n. 6 (quoting J. Calamari & J. Perillo, The Law of Contracts § 6–7 p. 210 (2d ed.1977)). Although promissory estoppel may be recognized as a theory of relief for breach of employment contract in some jurisdictions, it is not in North Carolina. *Id.* at 1385. The North Carolina courts have refused to apply the doctrine of promissory estoppel in actions for the breach of an employment contract. *See id; Home Electric Co. v. Hall & Underdown Heating & Air Cond. Co.,* 86 N.C.App. 540, 543, 358 S.E.2d 539, 541 (1987) ("The North Carolina cases which have applied the doctrine have only done so in a defensive situation, where there has been an intended abandonment of an existing right by the promise. North Carolina case law has not approved the doctrine for affirmative relief."); *Tatum v. Brown,* 29 N.C.App. 504, 224 S.E.2d 698 (1976); *see also Swanson,* No. 5:96–CV–674–BO(3), 1997 U.S. Dist. LEXIS 16054 at *6 ("North Carolina does not recognize the doctrine of promissory estoppel in actions for breach of an employment contract."). Accordingly, the theory of promissory estoppel does not assist Norman under North Carolina law.

In sum, accepting the factual allegations in the pleadings as true, Norman has failed to state a claim for breach of contract under North Carolina law.

### B. Under Florida law

Contract principles in Florida law applicable to Norman's claim closely parallel those found in North Carolina law. As in North Carolina, employment is terminable at the will of either the employer or employee in Florida. *Caster v. Hennessey,* 727 F.2d 1075, 1077 (11th Cir.1984); *McConnell v. Eastern Air Lines, Inc.,* 499 So.2d 68, 69 (Fla.Dist.Ct.App.1986). Statements in letters, executive memoranda, and employee handbooks or manuals do not give rise to enforceable contract rights in Florida unless they contain specific language which expresses the parties' explicit mutual agreement that the documents constitute a separate employment contract. *Quaker Oats Co. v. Jewell,* 818 So.2d 574, 577–79 (Fla.Dist.Ct.App.2002); *McConnell,* 499 So.2d at 69; *see also Webster v. Royal Caribbean Cruises, Ltd.,* 124 F.Supp.2d 1317, 1326 (S.D.Fla.2000) (finding that, under Florida law, policy statements by an employer, given to the plaintiff either orally or in handbook form, did not give rise to enforceable contract rights of employees without the parties' explicit mutual agreement); *Susanno v. Lee County Bd. of County Com'rs,* 852 F.Supp. 980, 985 (M.D.Fla.1994) (finding no binding contract under Florida law with employee handbook that, inter alia, outlined grievance procedures); *Lozano v. Marriott Corp.,* 844 F.Supp. 740, 742 (M.D.Fla.1994) (rejecting argument that discharge in violation of the progressive discipline policy in the Handbook gave rise to enforceable contract claim). Thus, in Norman's case, his contract claims must fall under Florida law as they did under North Carolina law. Absent any facts that, if accepted as true, would show that the Handbook and memoranda were expressly incorporated into an existing contractual agreement, Norman cannot base a claim on TradeWinds failure to abide by the policies contained therein.

■ In addition, as under North Carolina law, the provision of special consideration in the context of an employment contract will serve to enforce the contract only in limited circumstances. The special consideration rule has been applied in the employment context in cases where a contract expressly provides for permanent, lifetime, or fixed-term employment. For instance, in *Hesston Corp. v. Roche*, 599 So.2d 148, 151 (Fla.Dist.Ct.App.1992), an employer offered "lifetime employment" to an employee at the time of hire. The court noted that the provision of additional consideration may serve to enforce a contract for permanent or lifetime employment, taking it out of the default status of "indefinite in nature and terminable at will of either party." *Id.* at 151. Nevertheless, the court declined to find sufficient consideration in that case, emphasizing that the additional consideration must be beyond the services of the position, and beyond just "relinquishment of another position, even a better paying position." *Id.* at 152; *cf. Chatelier v. Robertson*, 118 So.2d 241, 242, 244–45 (Fla.Dist.Ct.App. 1960) (finding that where employee transferred his manufacturing business, together with the rights to "the name, trademark, goodwill, licenses and privileges of said business and said product" in exchange for employment for life, contract for life term was enforceable). In a different context, in *Iniguez v. American Hotel Register Co.*, 820 So.2d 953 (Fla.Dist.Ct. App.2002), the court enforced an exclusive sales-commission contract that expressly provided a definite term of five-years, thereby bypassing the terminable-at-will default rule. *Id.* at 955–56. While it based its decision on the principle that "where a contract for employment provides a definite duration, the employment contract is enforceable," *id.* at 955, the court also noted that the consideration provided was sufficient to support such a contract. *Id.* at 956. As consideration for

the contract in *Iniguez*, the employee, as a sales representative for the company, "agreed to pay all advertising expenses, sales trips, promotion expenses, market development costs, and operating expenses" including the purchase and funding of her own office in her foreign country of operation, and in exchange the employer promised not to appoint any other sales representative in the region. *Id.* at 954–55; *see also Murry v. Zynyx Marketing Communications, Inc.*, 774 So.2d 714, 715–16 & n. 2 (Fla.Dist.Ct.App.2000) (finding that requirement that employee provide employer with sixty days written notice of his intent to terminate the contract was sufficient consideration to support contract of employment of renewable one-year term); *cf. Lozano v. Marriott Corp.*, 844 F.Supp. 740, 742–43 (M.D.Fla.1994) (rejecting argument that a progressive discipline policy found in employee handbook provided the necessary consideration for a contractual employment relationship); *Lurton v. Muldon Motor Co.*, 523 So.2d 706, 709 (Fla.Dist.Ct.App.1988) (discussing and declining to apply "the narrow doctrine of 'additional consideration'" to create a just-cause condition for discharge).

■ In this case, even assuming that additional consideration could, in theory, enforce implied promises of seniority and termination procedures between an employer and employee, the consideration alleged by Norman here is insufficient. The travel, training, and equipment lock requirements of his job were part of his service with TradeWinds, thus cannot amount to consideration to alter the at-will employment arrangement. The fact that Norman had to take reduced pay in starting his position, or that he had superior credentials is likewise insufficient to serve as additional consideration under Florida law. Accordingly, Norman's complaint fails to state a claim that consideration

served to enforce a binding contract in this case.

■ Finally, although the theory of promissory estoppel applies to Norman's claims differently under Florida law than it did under North Carolina law, the theory provides no relief under the facts alleged. In order to create a binding promise under the doctrine of promissory estoppel, "the promisor must make a promise which he should reasonably expect to induce action or forbearance of a substantial character on the part of the promisee." *Golden v. Complete Holdings, Inc.*, 818 F.Supp. 1495, 1498 (M.D.Fla. 1993) (quoting *Mt. Sinai Hospital of Greater Miami, Inc. v. Jordan*, 290 So.2d 484, 486 (Fla.1974)); *Lozano v. Marriott Corp.*, 844 F.Supp. 740, 743 (M.D.Fla. 1994) (quoting Restatement (Second) of Contracts § 90 (1979)). Under Florida law, a promise of employment, terminable at the will of the employer, is not a promise which should reasonably expect to induce action or forbearance. *Leonardi v. City of Hollywood*, 715 So.2d 1007, 1009–10 (Fla.Dist.Ct.App.1998). Likewise, a promise relating to a contract for employment that is not "definite in time or term," or is not reasonable, also cannot serve to create a binding contract under the doctrine of promissory estoppel. *W.R. Grace and Co. v. Geodata Services, Inc.*, 547 So.2d 919, 924–25 (Fla.1989). For example, the court in *Grace* found that statements by a hiring contractor that work would "probably" be available for various terms in the future was not sufficiently definite, as a matter of law, to support an action on the basis of promissory estoppel. *Id.* at 925; *see also Maguire v. American Family Life Assur. Co.*, 442 So.2d 321, 323 (Fla.App.1983) (finding that "mere expectations," even where encouraged by the employer's actions, are insufficient to create binding employment contract terms). In addition, promissory estoppel will not serve to en-

force an oral promise that would otherwise be unenforceable as a long-term oral contract under the Florida statute of frauds. *Tanenbaum v. Biscayne Osteopathic Hospital, Inc.*, 190 So.2d 777, 779 (Fla.1966).

■ In this case Norman's claim must fail because the promise upon which he allegedly relied is lacking in the definiteness required to assert a claim for promissory estoppel. Norman argues that the terms of the Handbook and memoranda created an "implied promise" that TradeWinds would follow the seniority and discharge provisions in the handbook. (Resp. to Reply, p. 2). The terms of the Handbook and memoranda show, however, that such a promise lacked any definiteness in duration. As noted before, the April 25, 2000, memorandum provided that the "the policies in th[e] initial copy of the handbook may be revised from time to time as dictated by the operational needs of the company." (Ex. 1). Moreover, the terms of the handbook, itself, indicated that TradeWinds might not follow the progressive disciplinary procedure, in the event of an undefined "major" infraction. (Ex. 1, Handbook, p. 14). In addition, the statement of seniority policy does not promise, in the least, that an employee could not be terminated with cause (as Norman was) at any level of seniority. (Ex. 1, Handbook, pp. 10–11). Indeed, the Handbook only expressly indicates that "[s]eniority will be used for awarding lines of flying, upgrading, downgrading, training, furloughing, and giving preference for assigning open Time, extra sections and other flying. [sic]" (Ex. 1, Handbook, p. 10). Finally, Norman signed an "Acknowledgement of Conditional Offer of Employment" which stated that Norman agreed that "his employment may be terminated 'with or *without* cause or *notification, at any time.*'" (Compl., ¶ 16) (emphasis add-

ed).[8] Under these circumstances, any promise of continued employment under seniority rules, or progressive discipline, on the part of TradeWinds was entirely indefinite, subject to alteration at the will of the company at any time. Thus, the "implied promise" which Norman may have perceived on the basis of the Handbook and memoranda was, because of its indefiniteness, insufficient to support a claim of promissory estoppel under Florida law.

In sum, accepting the factual allegations in the pleadings as true, Norman has failed to state a claim for breach of contract under Florida law.

### III. Fraud Claim

▇▇▇▇▇ In support of his fraud claim, Norman alleges that TradeWinds promised to abide by the procedures in the Handbook, but never intended to do so, and used the Handbook as "bait to lure" Norman to accept employment with the company. (Resp., ¶ 23). As such, he claims that TradeWinds "fraudulently induced" him to enter into employment. (Compl., ¶ 9). Norman's claim fails as a matter of law. North Carolina, Florida, and Ohio law uniformly recognize the narrow scope of fraudulent inducement claims and subject them to heightened pleading requirements. In each state, the mere failure to carry out a promise in contract does not support a tort action for fraud. *Strum v. Exxon Co., USA,* 15 F.3d 327, 331 (4th Cir.1994) (applying North Carolina law); *Stow v. National Merchandise Co., Inc.,* 610 So.2d 1378, 1382 (Fla.Dist.Ct. App.1992); *Wall v. Firelands Radiology,*

*Inc.,* 106 Ohio App.3d 313, 326, 666 N.E.2d 235, 243 (1995). A failure to perform a promise can be a basis for fraud only where there is evidence the promissor had a "specific intent" not to perform at the time a promise was made. *Stow,* 610 So.2d at 1382; *Hoyle v. Bagby,* 253 N.C. 778, 781, 117 S.E.2d 760, 762 (1961); *Wall,* 106 Ohio App.3d at 326, 666 N.E.2d at 243.

▇▇▇▇▇ " '[M]ere generalities and conclusory allegations of fraud will not suffice' to sustain a fraud claim." *Strum,* 15 F.3d at 331 (applying North Carolina law). Thus, where a plaintiff does "nothing more than assert that [a promissor] never intended to honor its obligations under [an] agreement," dismissal as a matter of law is appropriate. *Id.*

> [F]raud is a much overused and misused cause of action. Its abuse has been fueled by the access it provides to otherwise unavailable discovery and to punitive damages. Its misuse has been exacerbated by [the] embrace of the 'promissory' form of fraud whereby a promise made with no intent to perform is deemed actionable as fraud. Unfortunately, too many cases have gotten to the jury and large tort verdicts have been rendered on a theory of fraud that had no business being anything other than breach of contract. The problem is not with the distinction between fraud and breach of contract, however, the problem lies in our courts' failure to appreciate or require competent proof of the distinct elements.

*Connecticut Gen. Life Ins. Co. v. Jones,* 764 So.2d 677, 682 (Fla.App.2000).

---

**8.** Norman argues in his brief that either written or verbal representations may contribute to the terms of an employment contract. (Resp., ¶ 15). Norman gives no indication as to whether any verbal promises were made in *his* case or what these verbal representations may have been. (*See* Resp., ¶ 15). Given that the existence, much less the substance, of these oral promises is not even alleged, the court cannot find that they support a claim on the basis of promissory estoppel. In any event, oral promises regarding long-term employment, in themselves, cannot be the basis of a promissory estoppel claim. *Tanenbaum,* 190 So.2d at 779.

▮ In this case, Norman has failed to initially allege facts which might show that TradeWinds even made a promise which was later broken. He contends that through the Handbook and memoranda TradeWinds created an "implied promise" to follow only the enumerated procedures therein. (Resp. to Reply, p. 2). But Norman's allegations characterizing the promise made are squarely contradicted by the statement in the April 25, 2000, memorandum, whereby TradeWinds assured that "[t]he policies in this initial copy of the handbook may be revised from time to time as dictated by the operational needs of the company." (Ex. 1). As such, although TradeWinds may have promised to abide by the procedures in the manual for as long as they were in effect, it made no express promise that those procedures would remain in effect for any period of time. Thus TradeWinds' "unilateral elimination" of the policies in the Handbook, (Resp., ¶ 24), could not amount to a breach of any promise made at the time of Norman's hiring. *See e.g., Nat'l City Bank v. Facilities Asset Mgt.*, 145 Ohio App.3d 340, 345, 762 N.E.2d 1060, 1064 (2001) ("It is well established that Ohio law does not allow a party to prove fraud by claiming that the inducement to enter into an agreement was a promise which is squarely contradicted by the written terms of that agreement.").

▮ Second, even if the court assumes that TradeWinds failed to perform certain promises to follow the procedures in the Handbook, Norman has failed to allege with the requisite particularity that TradeWinds never intended to follow, or knew that it would not follow, the outlined policies in the Handbook. Norman argues that TradeWinds

> never intended to comply with the Progressive Discipline Policy *as evidenced by* their reckless procedure in the termination of Plaintiff Norman. TradeWinds never intended to comply with the handbook used as bait for prospective pilots *as evidenced by* its reckless disregard of the promises of the handbook.... TradeWinds' actual performance demonstrates that they never intended to be bound by the things that they held out to recruit Plaintiff's employment.

(Resp., ¶ 12) (emphasis added). Such an argument misses the crucial point, that in order to be liable for fraud, the promissor must do something *more* than just disregard or break its promises. Simply because TradeWinds disregarded and failed to follow the outlined policies is not evidence that TradeWinds knew it never intended to follow the policies. Rather, it is only evidence that they did, in fact, ultimately disregard the promise. *See Wall,* 106 Ohio App.3d at 326, 666 N.E.2d at 243; *Century Properties Inc. v. Machtinger,* 448 So.2d 570, 573 (Fla.App.1984). Norman's bald allegation that TradeWinds acted "recklessly" only begs the question as to what facts, *beyond* the mere fact that TradeWinds failed to comply with its policies, support the claim that TradeWinds acted "recklessly" or with specific intent to defraud in this case. *See Strum,* 15 F.3d at 331 (finding that the mere allegation that promissor never intended to honor its obligations is insufficient to overcome dismissal).[9]

---

9. Norman argues that *Strum* is distinguishable from his case given that, in *Strum,* there was a written contract that had definite terms and times specified. (Resp., ¶ 22). But, this factual distinction is immaterial to the crucial flaw in both Strum's claim and Norman's claim. In particular, regardless of whether the promises made were written or oral, the plaintiffs in both cases alleged no facts which, when accepted as true, would show that the promissor had specific intent to break the promise at the time it was made. Accordingly, dismissal is proper.

Norman claims that *Telesphere International, Inc. v. Scollin,* 489 So.2d 1152 (Fla. Dist.Ct.App.1986), supports his case. In *Telesphere,* Scollin was hired to market a particular telecommunications system for the company, Telesphere. *Id.* at 1153. Eventually, because of technical difficulties, the development of the system by the company did not proceed as desired. *Id.* The company abandoned the project, and it terminated Scollin's employment. *Id.* Under the facts, accepted as true in that case, the employer was aware at the time of hire "of the real potentiality that the [telecommunications] system would fail and that, *if this indeed occurred, Scollin would be discharged.*" *Id.* (emphasis added). Telesphere did not inform Scollin of its knowledge of "the potential difficulties of developing the system and of its own then-existing intention to terminate him if the adversities actually came to pass." *Id.* at 1154. Furthermore, Telesphere later admitted in a specific conversation with Scollin that they didn't tell Scollin this information because they knew he would not sign the contract if he was told. *Id.* The court found that these facts supported a claim that Telesphere had fraudulently induced Scollin to join Telesphere. *Id.*

Norman's case is distinguishable from *Telesphere* on several critical points. First, unlike in *Telesphere,* in Norman's case TradeWinds *did* inform Norman of the indefinite status of the policies in the Handbook. TradeWinds explicitly explained in the April 25, 2000, Memorandum, the difficult financial position which the company faced:

> The company ... appreciates the dynamic nature of its current situation. Especially in light of the negative effects its prior financial performance has had on its overall financial strength. [sic] The policies in this initial copy of the handbook may be revised from time to time as dictated by the operational needs of the company.

(Ex. 1). As such, whereas *Telesphere* failed to inform Scollin of the potential that conditions could change on his project, TradeWinds explained the indefinite nature of the terms of the employment opportunity, including the possibility that policies could change. *Telesphere* is also inapposite because, there, the employer *knew* that Scollin would be terminated if his individually assigned project failed due to technical development reasons. Here, Norman has not alleged that TradeWinds knew he would be terminated upon a specific external event that was a "real potentiality" at the time of hire. Finally, *Telesphere* is distinguishable in that the employer in *Telesphere* admitted in a conversation to the employee that it purposefully withheld its awareness of contingencies, knowing that the employee would not sign on otherwise. Norman did not allege any communication in which TradeWinds admitted to withholding an awareness of future contingencies, knowing that he wouldn't sign on otherwise. On the whole, *Telesphere* involves a unique factual combination of an undisclosed termination that would definitely follow an undisclosed potential project failure, expressly withheld for the purpose of inducing employment. As alleged, Norman's case does not present such compelling facts. Thus, *Telesphere* is distinguishable, and the fraudulent inducement theory outlined in that case is inapplicable.

In sum, Norman has failed to allege specific facts, which, when accepted as true, would tend to support the elements of fraudulent inducement on the part of TradeWinds at the time of hire. Accordingly, his fraudulent inducement claim should be dismissed.

**Conclusion**

Given that Norman has failed to state a claim for breach of contract or fraudulent

inducement, IT IS RECOMMENDED that TradeWinds' Motion to Dismiss [Doc. # 10] be GRANTED.