**Robert T. WILSON, Jr., Plaintiff,**

v.

**Joseph Arrends MCALEER, John McAleer Orrell, and Steven Dale Smith, Defendants.**

No. 104CV00292.

United States District Court, M.D. North Carolina.

Jan. 5, 2005.

Grover Gray Wilson, Winston–Salem, NC, for Plaintiff.

Philip J. Mohr, Ronald R. Davis, Winston–Salem, NC, for Defendants.

## ORDER

BULLOCK, District Judge.

On December 1, 2004, the United States Magistrate Judge's Recommendation was filed and notice was served on the parties pursuant to 28 U.S.C. § 636. No objections were filed within the time limits prescribed by Section 636.

Therefore, the Court need not make a *de novo* review and the Magistrate Judge's Recommendation is hereby adopted.

**IT IS THEREFORE ORDERED** that defendants' motion to dismiss plaintiff's fraud and unfair and deceptive trade practices claims (docket no. 13) be, and the same hereby are denied.

## RECOMMENDATION OF MAGISTRATE JUDGE ELIASON

ELIASON, United States Magistrate Judge.

### Facts

The facts of this case, as alleged in plaintiff's amended complaint are as follows. Defendants are the former owners of a Krispy Kreme Doughnut franchise for parts of Texas and Louisiana. Plaintiff also states that at the time most of the events set out in the amended complaint occurred, defendants McAleer and Smith were directors and shareholders of Krispy Kreme and that Orell was an ex-employee and shareholder of Krispy Kreme. Plaintiff's occupation is not clear, but he refers to his personal relationship with defendants and past business ventures with Krispy Kreme.

Plaintiff claims that, based on his prior relationship with defendants and Krispy Kreme and his knowledge in the general industry, defendants engaged him to find a buyer for their franchise. Defendant Orrell initially negotiated with plaintiff, but the other defendants also agreed to the deal that plaintiff says they negotiated. Plaintiff alleges that they promised to pay him a 2–3% commission on the gross sales price and a 5% equity position in "the entity," payable by the buyer. Defendants also disclosed that Krispy Kreme had a right of first refusal which meant that, if plaintiff found a potential buyer, Krispy Kreme could match the offer. Plaintiff claims that defendants agreed that he would receive a 2% commission on the gross sales price if Krispy Kreme exercised its right and repurchased the franchise.

Relying on his agreement with defendants, plaintiff sought a buyer by making "numerous trips" around the country and investing "countless hours and expense." He also hired a financial delegate to coordinate an audit of the franchise and gathered and processed financial information for prospective buyers. Eventually, plaintiff was able to identify Arbor Private Investment Company as a possible buyer. He then met with defendants and discussed the pending offer and the possibility that Krispy Kreme would match the offer. He reminded them that he expected a commission no matter who eventually bought the franchise and says that they all agreed. Shortly thereafter, defendants submitted a letter of intent from Arbor to Krispy Kreme and informed the company that they intended to sell the franchise.

On or about December 20, 2002, defendants told plaintiff that Krispy Kreme was demanding a 5 percent "re-franchise fee" if they sold to an outside buyer. Plaintiff believes that this fee was not part of the franchise agreement between . Krispy Kreme and defendants, but was created by Krispy Kreme in order to give it a competitive advantage over outside buyers. In fact, the appearance of the re-franchise fee made Arbor skeptical of the proposed transaction. Still, despite plaintiff's urging, defendants did not resist Krispy Kreme's demands for the fee.

Even with the demand for the re-franchise fee, negotiations with Arbor continued and, on March 22, 2003, plaintiff presented defendants with a formal offer of $70,000,000. In presenting the offer he told them that he felt Krispy Kreme would match the offer and that he expected his commission. He says that defendants again agreed.

Negotiations between defendants and Arbor continued, with defendants making a counter offer and Arbor making a new confidential offer of $73,000,000. In presenting that offer, plaintiff again stated his understanding that Krispy Kreme would likely match it and defendant Orrell again allegedly agreed to pay him his commission regardless. However, according to plaintiff, defendants never accepted or rejected the confidential offer, but instead secretly shared it with Krispy Kreme which then agreed to repurchase the franchise for $67,000,000. When plaintiff attempted to continue the negotiations between defendants and Arbor, he was unsuccessful in getting defendants to do so.

Around April 3, 2003, plaintiff spoke to Orrell by telephone and found that the confidential offer had been shared with Krispy Kreme. Orrell told plaintiff that the offer had not been what defendants expected, yet refused a proposal from plaintiff to continue negotiations with Arbor or seek another buyer. Orrell did not reveal to plaintiff that Krispy Kreme had exercised its right of first refusal. Then, on April 9, 2003, defendants Smith and McAleer resigned their positions on Krispy Kreme's board of directors. Plaintiff says that they did this in order to distance themselves from Krispy Kreme's decision to repurchase the franchise.

Finally, at a May 2, 2003 breakfast meeting, Orrell told plaintiff that Krispy Kreme had offered to repurchase the franchise and that defendants had accepted the offer. He finally admitted that defendants had shared Arbor's offer with Krispy Kreme prior to Krispy Kreme making the offer, but denied that Krispy Kreme's purchase of the franchise for $67,000,000 was a match of Arbor's offer. Defendants further refused to pay plaintiff his commission on the sale.

Based on the facts described above, plaintiff sued defendants in state court. That action was removed to this Court where defendants filed a motion to dismiss

portions of the complaint. Plaintiff responded with an amended complaint alleging breach of contract, fraud, and unfair and deceptive trade practices. Defendants now move to have the fraud and unfair and deceptive trade practices claims dismissed pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b).

### Legal Standards

Defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6) contends that plaintiff has failed to state a claim upon which relief can be granted. Such a motion cannot succeed " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Republican Party of North Carolina v. Martin,* 980 F.2d 943, 952 (4th Cir.), *cert. denied,* 510 U.S. 828, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993), *quoting Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Further, the Court must assume that the allegations in the amended complaint are true and construe them in the light most favorable to plaintiff. *Id.* Here, the complaint will be judged under the heightened pleading standards of Fed.R.Civ.P. 9(b). That rule requires that the circumstances giving rise to a claim for fraud be pled with particularity.

### Discussion

As stated above, defendants seek dismissal of plaintiff's fraud and unfair and deceptive trade practices claims. The basis for their argument is that the case is really nothing more than a straightforward contract action over plaintiff's alleged right to a commission and that plaintiff should not be allowed to turn the case into a tort action by adding fraud and unfair trade practices claims. They also claim that plaintiff has not adequately pled a claim for fraud or unfair trade practices.

■■■ To allege a claim for fraud in North Carolina, a party must plead five "essential elements: (1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage." *Breeden v. Richmond Community College,* 171 F.R.D. 189, 194 (M.D.N.C.1997) (citations omitted). Not only must these elements be pled, but under Fed.R.Civ.P. 9(b) "the circumstances constituting fraud or mistake shall be stated with particularity." Courts apply this to mean that plaintiffs must set out the " 'time, place, and contents of the alleged fraudulent misrepresentation, as well as the identity of each person making the misrepresentation and what was obtained thereby.' " *Id.* at 195, *quoting, Liner v. DiCresce,* 905 F.Supp. 280, 287 (M.D.N.C.1994).

■■■ Here, plaintiff has alleged in his amended complaint that defendants, either together or through Orrell, told him that they intended to sell their Krispy Kreme franchise. They represented to him that they wished to sell it to an outside buyer or to Krispy Kreme if it matched the offer of any outside buyer pursuant to a right of first refusal. He claims that they promised to pay him commission on either of these two types of sales and that, based on all of these statements, he then proceeded in good faith to expend his time and resources to secure an outside offer to buy the franchise.

Plaintiff contends as the basis for his fraud claims that defendants' statements and actions were all part of an elaborate scheme to provide an independent basis for establishing and placing a high value on their franchise and that defendants never had an intention of complying with their agreement with plaintiff, but instead intended to use it for their aforesaid ulterior purpose of legitimizing a high price for the repurchase of the franchise by Krispy

Kreme. Plaintiff alleges that, from the very beginning, defendants never intended to sell their franchise to an outside buyer or even to have Krispy Kreme exactly match an outside buyer's price. However, they needed bids from such buyers in order to raise or legitimate the price that they could charge Krispy Kreme. Plaintiff claims that, in order to procure the higher price, defendants engaged him to get outside buyers to make bids. Once he did this, defendants did not accept, reject, or continue to negotiate over the bid as would be normal and expected, but instead used the bid as an attempt to legitimate the $67,000,000 purchase price by Krispy Kreme. Having used him to raise the price for the Krispy Kreme purchase, defendants then declined to pay plaintiff his commission by claiming that the repurchase offer was not a match of the outside offer. He alleges that all of this was their intent from the very beginning.

Defendants have raised several arguments in favor of dismissal of the fraud claim. First, they claim that plaintiff has not pled a claim for fraudulent inducement because his claim is one of an omission and he has not identified a duty on the part of defendants to disclose that they intended to try to persuade Krispy Kreme to repurchase the franchise. This argument fails because plaintiff's claim does not appear to be based on omissions. Instead, he claims that defendants affirmatively represented to him that they were willing to sell to an outside buyer or to Krispy Kreme if it matched any outside offer and that they would pay him a commission if either event occurred. He also claims that these representations were false.

Defendants also make several more equally unsuccessful arguments in favor of dismissal. For instance, they claim that plaintiff has not identified any gain by defendants. However, plaintiff alleges that they gained his services and an in-creased market price that they could use to negotiate with Krispy Kreme and legitimate the price used by Krispy Kreme to purchase the franchise. Defendants also contend that plaintiff has failed to show that concealing or misrepresenting their intentions regarding their desire to sell to Krispy Kreme is a material fact because plaintiff knew all along that Krispy Kreme could, and likely would, buy the franchise. They also say that plaintiff cannot claim reasonable reliance for this reason. This argument fails because plaintiff alleges not just that defendants hoped to sell to Krispy Kreme, but also that defendants never had any intent to sell to any other buyer and that they purposely acted in such a manner and structured the sale of the franchise so that they could claim that the purchase by Krispy Kreme was not part of a match in response to the offer by Arbor. Plaintiff's claim is that he was falsely led to believe that any purchase by Krispy Kreme would be made in good faith as a true match of any outside offers he procured.

Finally, defendants state that plaintiff has not alleged that he would have done anything differently had he known all of the facts that he alleges were present and that he has not shown how he was damaged beyond the lost commission. However, plaintiff alleges in his amended complaint that he expended a great deal of time and at least some money in pursuit of offers for defendants. Obviously, he would not have done this if he realized that defendants did not intend to negotiate in good faith with third-party buyers and instead intended to sell to Krispy Kreme in such a way as to avoid paying him a commission.

Overall, plaintiff has alleged that defendants misrepresented (1) their intentions regarding the sale of their franchise, (2) the purposes of the services they were

asking him to provide, and (3) their intent to ever pay him a commission. He has also alleged that these misrepresentations were made in order to deceive him, so that he would render his services in behalf of defendants' cause, that he was deceived, and that he was damaged when he expended time and money trying to perform his part of a contract that defendants never intended to honor because of their ulterior purpose. In many cases he has provided the dates, locations, and speakers for the false statements that he alleges were made. Plaintiff has alleged the elements of fraud and has alleged them with sufficient particularity to survive a motion to dismiss.

■■■ In addition to claiming that plaintiff did not plead his fraud claim with particularity, defendants also argue that plaintiff has not pled a tort that is separate from his contract claim. Where fraud allegations are raised in what is otherwise a breach of contract case, the Court of Appeals for the Fourth Circuit has warned that an "attempt to turn a contract dispute into a tort action with an accompanying punitive dimension is inconsistent both with North Carolina law and sound commercial practice." *Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp.,* 15 F.3d 327, 329–30 (4th Cir.1994). The mere failure to carry out a promise in a contract cannot support a fraud action. *Id.* at 331. Instead, a failure to perform can be the basis for a claim only where the promisor had a specific intent not to perform a the time the promise was made. *Norman v. Tradewinds Airlines, Inc.,* 286 F.Supp.2d 575, 594 (M.D.N.C.2003), citing, *Hoyle v. Bagby,* 253 N.C. 778, 781, 117 S.E.2d 760, 762 (1961).

Of course, as stated above, plaintiff has properly pled an allegation of fraud in the inducement. Still, relying on the outcome in *Norman,* defendants argue that dismissal is proper because plaintiff has made no more than conclusory allegations that they never intended to honor their agreement with him. This is not correct.

The case at bar is easily distinguishable from *Norman.* In that case, the plaintiff alleged only that the defendants' failure to perform under a contract showed that it never intended to perform under the contract. Of course, mere breach, even if intentional, is not a tort and the complaint in *Norman* was dismissed. Here, plaintiff's allegations are based on more than defendants' alleged failure to perform. Plaintiff provides particular allegations of defendants' motive, actions, and statements in support of the claim of fraud. First, plaintiff argues that if defendants wanted to sell their franchise to Krispy Kreme with a high sales price, defendants McAleer and Smith's positions as Krispy Kreme insiders might well create the necessity to get someone such as plaintiff to establish a high market price using outside bids.[1] Second, it seems unlikely that plaintiff would have risked his reputation with others in the industry by inflating the market price just so that a sale to Krispy Kreme could occur unless he received something for his efforts. This makes deceit a necessary factor to be used by defendants in order to secure plaintiff's services. Third, when Krispy Kreme began requesting a 5% re-franchise fee, defendants allegedly did not protest, even though plaintiff claims that the fee likely is not a legitimate one and even though he urged defendants to protest the fee be-

---

1. According to plaintiff, the media has reported that the Securities and Exchange Commission is currently scrutinizing the franchise repurchase that gave rise to this case. While the actual investigation may well mean noth-

ing to the case, the fact that the SEC takes an interest in such transactions involving insiders serves to at least provide a motive for many of the actions that plaintiff alleges that defendants undertook.

478

cause it would hurt negotiations with third-party buyers. Fourth, defendants allegedly did not actually accept or reject Arbor's confidential offer, but instead secretly shared it with Krispy Kreme. Fifth, defendants allegedly did not seek to have Krispy Kreme match the offer, but instead sold to Krispy Kreme for less money than Arbor had offered.[2] Sixth, defendants allegedly sold at the lower price even though they represented to plaintiff that they were unhappy with the size of Arbor's larger offer. Finally, defendants allegedly refused to allow plaintiff to attempt to negotiate a larger offer from Arbor or another buyer. If proven, these allegations could provide corroborating evidence of plaintiff's claims of fraud.

While it is important not to lose sight of the fact that plaintiff's allegations are nothing more than that at this point, the circumstances surrounding his allegations raise at least the possibility that his fraudulent inducement allegations have some merit. His allegations may turn out not to be accurate or defendants may well be able to provide perfectly reasonable non-fraudulent explanations for their behavior. However, at this point, plaintiff has set out a scenario that, if proved, suggests the possibility of a fraudulent and deceitful scheme that extended prior to the formation of any contract between plaintiff and defendants and continued through the execution of the contract. This is all that he needs to survive a motion to dismiss.

█ Having found that plaintiff has sufficiently pled a separate fraud claim, there is no need for the Court to engage in an extensive discussion of the defendants' motion to dismiss his unfair and deceptive trade practices claim. This is because both parties agree that a proper allegation of fraud is also the basis for an unfair and deceptive trade practices claim. *See Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C.App. 390, 417, 537 S.E.2d 248, 266 (2000).[3] Accordingly, defendants' motion to dismiss the unfair and deceptive trade practices claim will be denied.

**IT IS THEREFORE RECOMMENDED** that defendants' motion to dismiss plaintiff's fraud and unfair and deceptive trade practices claims (docket no. 13) be denied.

Dec. 1, 2005.

2. Based on the numbers presented in the complaint, it appears that this may be true even if the 5 percent refranchise fee and plaintiff's commission are subtracted from Arbor's offer. If this turns out to be correct, this seemingly irrational business behavior could certainly be seen as suggesting some sort of improper ulterior motive or plan on the part of defendants.

3. While plaintiff's fraud allegations are enough to also allege a claim for unfair and deceptive trade practices, it is also worth nothing that conduct other than fraud can also support such a claim. It is not entirely clear whether or not plaintiff is making any allegations of unfair and deceptive trade practices beyond his allegations of full-blown fraud.